one of the partners alone, relying on the act of 1789. See 1 Rev. St. c. 31, § 89. *Held*, that he might do so, as that act did not affect the contract, but only extended the remedy.

The defendant and his two brothers carried on business as merchants in the state of Maryland, under the firm name of John Goulding & Brothers, and in the year 1791 gave the plaintiff the promissory note on which this action was brought, for a debt of the said partnership, signed John Goulding & Brothers, the style of the firm. The defendant (being the only partner in this state) was sued alone; he pleaded in abatement to the action that this contract was entered into in the state of Maryland, and that the other partners who were living and not named ought to be made defendants. To this plea there was a general demurrer.

Mr. Graham, in support of the demurrer, relied wholly on the fifth section of the act of assembly of this state (1789, 57,688).

Woods & Martin contended that this case came within the rule of lex loci, and that to allow this act the operation insisted on for the plaintiff would substantially alter the contract.

But PATTERSON, Circuit Justice, took a distinction between the contract and the remedy, and observed that the contract remained the same, notwithstanding this act, and that the remedy only was extended.

And SITGREAVES, District Judge, accordante.

A respondeas ouster was awarded.

---

# Case No. 10,702.

## The PANAMA.

[1 Deady, 27;[1] 1 Ore. 418.]

District Court, D. Oregon. Sept. 13, 1861.

PILOTS — WARRANT — STATE CONTROL — ACT OF CONGRESS—ABROGATION OF STATE LAW.

1. When a warrant to act as pilot appears upon its face to have been regularly issued, its validity cannot be questioned collaterally, or in a suit between third persons.

2. The possession and exhibition of the warrant authorize the master of a ship to treat the holder as a duly constituted pilot; and, as between third persons, is conclusive evidence that the conditions which the law attached to the appointment have been complied with.
[Cited in The Alcalde, 30 Fed. 137.]

3. Pilotage being "a rightful subject of legislation," the territory of Washington has power to pass pilot laws.
[Cited in The Ullock, 19 Fed. 212; The Abercorn, 26 Fed. 879; The Alcalde, 30 Fed. 135.]

4. The act of August 7, 1789 (1 Stat. 54), is not a grant of power to the states to pass pilot laws, but a legislative recognition that the power is concurrent in the states and the United States until exercised by the latter.
[Cited in The Glenearne, 7 Fed. 607.]

5. Does the act of March 2, 1837 (5 Stat. 153), include a territory? Query.
[Cited in The Glenearne, 7 Fed. 607; The Ullock, 19 Fed. 212.]

6. Whenever congress exercises the power of passing laws on the subject of pilotage, so far the power becomes exclusive; and all prior laws of the states within the purview of such enactments are at once abrogated and cease to have effect.

7. The act of August 30, 1852 (10 Stat. 75), provides for the employment of pilots on vessels propelled in whole or part by steam, engaged in carrying passengers on any of the bays, lakes, rivers, or other navigable waters of the United States.
[Cited in The George S. Wright, Case No. 5,340; Joslyn v. Nickerson, 1 Fed. 134.]

8. This act, so far as it goes, supersedes all state laws regulating the employment of pilots on this class of vessels.

9. In the construction of the act of congress of 1852, its operation is not to be restrained or limited because of the pre-existence of state laws regulating the employment of pilots under like circumstances.

10. There is no presumption that congress did not intend to abrogate the state law; but, on the contrary, the power over the subject being paramountly in congress, and only permitted to the states by sufferance, in case of conflict between the two the presumption is the other way.
[Cited in The Alcalde, 30 Fed. 135.]

In admiralty.

George H. Cartter, for libellant.

David Logan, for claimants.

DEADY, District Judge. The libel of Charles Edwards, libellant, was filed March 27, 1861, and alleges that on March 17, 1861, and thereafter, the libellant was a duly licensed pilot, attached to the pilot boat California, on the Columbia River bar, according to the laws of Oregon; and that on said date libellant boarded the steamship Panama "just outside" the bar, and offered his services as pilot to conduct said ship over said bar to the port of Astoria; that said ship was at the time of such offer bound in, and libellant was the only pilot authorized to pilot said ship on board of her on said day, and was the first pilot to offer his services to such ship on that day outside of said bar. That on March 22, 1861, the said ship being bound outward over said bar, libellant hailed her at the port of Astoria and offered his services as pilot to conduct her across said bar to the sea; and that libellant was the first pilot who offered his services to said ship on said "occasion" and that there was no pilot on said ship "at the time." That said ship when inward bound as aforesaid, drew 14 feet of water, and that libellant is entitled to $12 per foot or full pilotage for this tender of services—in all, $168; and that when outward bound, as aforesaid said ship drew 13 feet of water, and that libellant is entitled to $6 per foot or half pilotage for this tender of services—in all $78; and that said sums of money remain due and unpaid to the libellant. On May 1, 1861, the claimants, Holladay and Flint, answered the libel admitting the facts

---

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

stated, except, that the libellant "was duly authorized according to the laws of the state of Oregon and the United States to pilot seagoing steamships carrying passengers;" and that libellant was the first pilot who offered his services to said ship on said March 17 or 22, which allegations they deny. The answer also avers that on March 17, when libellant boarded said ship, "Moses Rogers, a pilot duly authorized and licensed in accordance with statutes of the United States, to pilot steamboats carrying passengers on the waters of the Columbia bar, coast and Puget Sound, and to San Francisco, California, was on board the said ship and had charge and control of her as pilot;" and that said Rogers piloted said ship on said occasion from the high sea over said bar to the port of Astoria. That on March 22, aforesaid, said Rogers was the first qualified pilot who offered his services to the master of said ship, and did on said date pilot said ship across said bar to the open sea. That said Panama is a sea-going steamship, propelled in whole or in part by steam, and on March 17 and 22, aforesaid was engaged in making a voyage from San Francisco to Portland, carrying freight and passengers. That on the date last aforesaid, said "Rogers was a duly licensed bar pilot according to the laws of the territory of Washington" regulating "pilotage on the Columbia river bar and shoalwater bay, passed February 28, 1854" [Laws 1854, p. 389]. On July 1, libellant filed an amended libel admitting that on March 17 said Rogers, "a person pretending to be a duly authorized pilot was on board said ship," and piloted her across the bar to Astoria, but avers that libellant offered his services before said Rogers did; also admitting the same as to the voyage out on March 22, but avers that libellant "hailed said ship first and offered his services as a pilot;" and that said Rogers pretends to be an authorized pilot by virtue of a license from one Pitfield, "a person pretending to be a supervising inspector of the fourth district of the United States," and that "if said license is genuine" it does not authorize said Rogers to pilot steamships over the Columbia bar; also admitting that Rogers received a license from the pilot commissioners of the territory of Washington under the act of 1854, as alleged, but avers that Rogers never performed the conditions imposed by said act, and therefore said license never took effect, and that said act has long since been repealed, and that all licenses issued under it became void on such repeal; also admitting that the Panama is a seagoing vessel, propelled in whole or in part by steam, and was engaged in carrying freight and passengers between San Francisco and Portland, as alleged.

From the evidence it appears that the libellant was appointed a pilot on Columbia river bar under the Oregon act of October 17, 1860 [Laws 1860, p. 43], by a warrant from the "board of pilot commissioners," bearing date,

January 22, 1861; and that Rogers was appointed such pilot under the territory of Washington act of 1854, by a warrant from the "board of pilot commissioners" bearing date January 13, 1860. In the argument for libellant it is contended, that this warrant to Rogers is without legal effect, because it does not appear that he gave bond and kept a suitable boat on the bar as required by the act. But Rogers is not a party to this suit, and the ship is not liable for any want of authority on his part which was not apparent to the world. The exhibition of his warrant or commission, regular upon its face, entitled him to be treated and authorized the ship to receive him as a pilot. By the act of the territory of Washington a pilot "is authorized to take charge of any vessel requiring his services, but shall first show the master his warrant." Upon the production of the warrant the master had a right to presume that the conditions of Rogers' appointment—if any—had been complied with to the satisfaction of the commissioners who, by the act, have complete control of the subject of the appointment, suspension and removal of pilots. It is true that the act of 1854 requires a pilot, before entering upon the duties of his office to give bond to the commissioners, but it does not require or allow that he shall keep the bond to exhibit to masters of vessels or that it shall appear upon the face of the warrant that the bond has been given. The act does not expressly say that the bond shall be given before or at the time the warrant issues, but such is the reasonable construction, and it is fair to presume that the commissioners to whom the bond is to be given would require it to be done at or before the delivery of the warrant. As to the alleged repeal of the act of 1854, the fact appears to be that on January 31, 1861, section 4 of said act was repealed and another enacted in lieu thereof, requiring each pilot to keep a boat on the bar "of not less than fifty tons burden," while the section repealed only required the pilot to keep such boat "as the commissioners might approve." This was no repeal of the act as such, and in no way makes the warrant before issued to Rogers "void and of no effect." It only imposed a fixed rule in relation to the kind of boat the pilot should keep on the bar instead of leaving it to the discretion of the commissioners as before.

It is further insisted on the part of the libellant that a territory has no authority to pass pilot laws and that therefore the warrant to Rogers is invalid. The argument is grounded upon the assumption that the act of August 7, 1789 (1 Stat. 54), grants the power to the states to pass pilot laws and that a territory is not included in the word "states," and therefore it has no power to legislate on the subject. Admitting the premises for the sake of the argument, the conclusion does not follow. The power to govern the territories subject to the consti-

PANAMA (Case No. 10,702)

[18 Fed. Cas. page 1070]

tution is in congress irrespective of the powers which it may exercise, within the limits of a state. This power may be exercised mediately or immediately, by the creation of a territorial government therein, with power to legislate for the territory, or by the passage of laws directly by congress, without the intervention of the territorial government. The act of congress (10 Stat. 172), organizing a government for the territory of Washington, declares that the "legislative power of the territory shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States." A rightful subject of legislation is a subject, which from the nature of things, the course of experience, the practice and genius of our government properly belongs to the legislation to regulate and control rather than the judicial or executive departments of the government. Pilots and pilotage are as much the proper subjects of legislation as any subject ever regulated by the law of a territory, and have been so from their earliest history. Congress has power to legislate upon this subject in the territories. Being "a rightful subject of legislation," in this case congress has given this power to the territorial legislation. Neither was the act of 1789 a grant of power from congress to the states to legislate on the subject of pilots and pilotage. The power is concurrent in the state and national government until exercised by the latter, when so far as exercised it becomes exclusive. If the power was exclusively in the national government, congress could not grant it to the states, and being concurrent it could not nor need not. This view is in substantial accordance with the doctrine of Cooley v. Board of Wardens, 12 How. [53 U. S.] 316, that the act of 1789 is a mere legislative recognition of the concurrent power of the states over this subject, so long as congress does not act in the matter.

The warrant to Rogers is further objected to because it is headed "Temporary." The word is superfluous, because if it has any legal effect, it is the same that the law would give the warrant without it, namely, that the party was to hold the place during the pleasure of the commissioners. So far as appears the warrant has never been revoked. For these reasons I conclude that the territorial act of 1854 is a valid act, and that Rogers was a duly qualified pilot thereunder on the Columbia bar, on March 17, 1861, when the libellant boarded the Panama on her inward bound voyage.

By the act of Oregon, the first pilot that offers his services outside the bar, to a vessel bound inward, is entitled to full pilotage, whether his services are accepted or not, and to one bound outward under like circumstances, half pilotage. Under this provision the question is made by counsel whether libellant or Rogers first offered his services to the ship on March 17th, on the inward bound voyage? It is substantially admitted by the pleadings that the libellant was the first pilot that in fact boarded the Panama outside the bar, and the evidence proves satisfactorily that Rogers was on board at the time, hired by the month, to serve as pilot between the port of San Francisco and Portland, and that he piloted the ship in over the bar on the occasion in question. Under these circumstances is Rogers to be considered a bar pilot who tendered his services as such to the ship before the libellant? The principal objection to his being so considered is that he was not on the bar at the time of the offer, and did not maintain a pilot boat there. I do not think the objection sufficient. The libellant, for anything that appears, might have gone half way done the coast to meet the Panama, and if the master was willing to take him on then, and bring him up to the bar as a pilot, it would be a good offer of his services so as to prevent another pilot who remained on the bar from first offering his services. Nor do I think the court can in this suit consider whether Rogers kept a boat on the bar at the time to cruise for vessels or not. As to third persons, so long as his warrant is unrevoked, I think he must be considered a qualified bar pilot. If Rogers was libellant in a suit, claiming compensation as a pilot, it might possibly be shown in bar of such claim that he did not remain on the bar and cruise for vessels with a sufficient boat, etc. But even this is doubtful. The legislature has confided the administration of the law in these matters to the pilot commissioners. Whenever it appears that a pilot is evading the law and using his authority to the detriment of commerce or the pilot service, they can and should revoke his warrant.

The conclusion reached upon this point renders it unnecessary to consider whether the act of 1837 (5 Stat. 153) applies to this case. By that act, the master of a vessel upon waters that form the common boundary between two states is authorized to take a pilot from either; and therefore is not required to take the first pilot that offers, but may take the second one from the other state. Whether the word "state," as used in this act should be construed so as to include a territory, is a question not free from doubt. The case is within the mischief intended to be remedied by the act, and it seems to me might be held to come within its spirit and purview, without any violation of principle. I do not think it comes within the reasoning or considerations that controlled the court in Hepburn v. Ellzey, 2 Cranch [6 U. S.] 445, in which it was held that under the judiciary act giving the national courts jurisdiction of controversies between citizens of different states, that a citizen of the District of Columbia could not sue in such courts, as a citizen of a state,

because such district was not a member of the Union. But waiving this point, the libellant not being the first pilot to offer his services as alleged in his libel, on the inward bound voyage, cannot recover on that claim.

Upon the claim for half pilotage, I find from the evidence that on March 22, between upper and lower Astoria, and below the custom house, as the Panama was proceeding to sea, the libellant rowed out into the stream, hailed the ship, and offered his services as a pilot; and that the master of the Panama paid no attention to the offer, but steamed down the stream some three or four hundred yards, opposite the wharf at lower Astoria. At this point the ship was stopped, and Rogers, who appears to have been waiting for her, went on board immediately and piloted her out to sea; and that this all occurred on what is understood among navigators who frequent that harbor as pilot-ground. It does not appear that the limits of the pilot-ground have ever been authoritatively defined, and are only known from local usage.

As a conclusion of fact from the foregoing, I find that the libellant first offered his services to the ship on this occasion, and assuming that the act of 1837 does not apply to a water which is the boundary between a state and a territory, the libellant as against a territory of Washington pilot, was entitled by reason of such offer to be employed or paid his claim for half pilotage. But it also appears from the evidence and the admission of the pleadings, that Rogers, on March 22, was a duly licensed steamboat pilot, under the act of 1852. It is admitted by the pleadings that the Panama is and was a vessel propelled by steam and engaged in carrying passengers. This brings her within the class of vessels provided for in the act of 1852, and the acts of 1838 [5 Stat. 304] and 1843 [Id. 626], of which it is amendatory, and commonly called the "Steamboat Acts." The avowed purpose of these acts is, "to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam." As a means to this end, the act of 1852 (10 Stat. 75) provides that "instead of the present system of pilotage of such vessels, and the present mode of employing engineers on the same," there shall be a board of inspectors in each collection district who shall examine, "license and classify all engineers and pilots of steamers carrying passengers;" and that "it shall be unlawful for any person to employ, or any person to serve, as engineer or pilot on any such vessel who is not licensed by the inspectors; and any one so offending shall forfeit one hundred dollars for each offence." It is also admitted that the libellant was not a duly licensed pilot under the act of congress of 1852. But it is maintained on his behalf that congress did not intend by the passage of this act to supersede the existing state laws on the subject

of pilotage, because it is said the act does not expressly so declare—because of the inconvenience that would result from such construction, and because it being eminently proper and necessary that the states should control this subject themselves, it is therefore not to be supposed that congress would interfere with it.

As to the power of congress in the premises there can be no doubt. The constitution (article 1, § 8) gives congress power "to regulate commerce with foreign nations and among the several states." This includes the power to regulate navigation, and pilot laws are regulations of navigation. In Cooley v. Board of Wardens, 12 How. [53 U. S.] 315, the supreme court say: "That the power to regulate commerce includes the regulation of navigation, we consider settled. And when we look to the nature of the service performed by pilots, to the relation which that service and its compensations bear to navigation between the several states, and between the ports of the United States and foreign countries, we are brought to the conclusion, that the regulation of the qualification of pilots, of the modes and times of offering and rendering their services, of the responsibilities which shall rest upon them, of the powers they shall possess, of the compensation they may demand, and of the penalties by which their rights and duties may be enforced, do constitute regulations of navigation, and consequently of commerce, within the just meaning of this clause of the constitution." The power of congress being established, what was the intention in this respect in the passage of the act of 1852? In its language nothing can be found limiting its operation as to place. It expressly applies to pilots on all vessels propelled by steam and carrying passengers upon "the bays, lakes, rivers and other waters of the United States." As to the argument founded upon the assumed inconvenience and impropriety of superseding the state pilot laws I do not assent to the assumption nor perceive the force of the argument drawn from it. The question of convenience and propriety is for congress to determine. The frequent and almost wanton loss of life and property under the former system of piloting steam vessels and employing engineers thereon, and the inability of the separate states to remedy the evil, was a sufficient reason, if any reason besides its own will was necessary, for the action of congress. Nor are the acts of congress to be limited in their legal import or restrained in their operation, upon the idea that some state law is thereby rendered inoperative, or that some state prefers some other system or regulation. The act of congress on this subject is paramount, and all state legislation which is inconsistent or in conflict with its terms, reasonably and fairly construed, must give way. Nor is it true that there is any presumption in favor of the state law and against the act of congress, which in a doubt-

ful case would determine the question in favor of the former. On the contrary, when, as in this case, the power over the subject is paramountly in congress and only permitted to the state by the sufferance of the former, the presumption, if any, would be the other way. The wisdom and necessity of the act were questions for congress to determine, and not the court or state. There is, then, no reason why the terms of the act should not be taken in their natural and ordinary import, so that, when it declares that the regulations therein prescribed, shall be substituted for the present system of pilotage of steam vessels, it shall be held and construed to mean what it says. At the date of this act what was the existing system which these regulations were to take the place of? Certainly, it was the laws and usages of the states and ports therein, regulating and governing the subject of pilots and pilotage of steam vessels. The regulations of the act were to be instead of—to take the place of this system of the states. Wherever this system existed, in this respect it was to be changed and superseded by the establishment of these regulations. Is the Columbia river bar in any way exempt from the operation of these general words? It is a water of the United States, and at the date of the act there was a state system of pilotage for steam vessels upon it. As the state system did not extend beyond the waters and ports within its limits, there can be no ground for presuming or assuming that the proposed change was intended to be confined to the high seas—as in such case the act would work no change at all. Because the state has a system of pilotage upon the Columbia bar with which these "regulations" interfere, so far as steam vessels are concerned, is the substantial reason urged why the bar should be considered as not within the provision of the act. If this had been the intention of congress in passing the act, instead of declaring, as it did, that the regulations therein should take the place of the then existing system, it would have read somewhat in this wise: "The following regulations shall be observed instead of the present system of pilotage for steam vessels—that is the state pilot laws and usages—only where the present system does not exist." I am satisfied that the act applies to the employment of pilots on steam vessels engaged in carrying passengers, throughout the whole voyage and every part of it. It is made a crime for the master of any such vessel to employ any one as a pilot unless first licensed by the United States inspectors, or for any one not having such license to be so employed. For the greater security of life, it seems to have been the intention of congress to no longer leave this subject to the conflicting and inefficient legislation of the several

states, or the total lack of it, but to provide a general rule and uniform authority for examining and licensing pilots for steam vessels; men who were not merely acquainted with the channels, rocks and shoals of a particular water or route, but also with the machinery, action and motive power of steam vessels, and who were competent to control and handle them under any or all emergencies. A bar pilot under the state system may be a good seaman and familiar with the currents, tides and shoals of his pilot-ground, but this alone is not sufficient to qualify him to take charge of a steam vessel.

The difficulty suggested by counsel, that pilots licensed by the United States inspectors would be wanting in local knowledge is possible, but not very probable. The inspectors are to inquire diligently into the qualifications of the applicant, and for this purpose may examine witnesses. One of the necessary qualifications of a pilot for any vessel is a knowledge of the particular pilot-ground for which he is licensed. The inspectors are appointed within collection districts, and their licenses are for routes within such district. They may, with good reason, be supposed to have as much knowledge and means of information in the premises as a board of pilot commissioners appointed by the state. As yet no inspectors have been provided for this district, and the administration of the act in this respect has devolved upon the supervising inspector living upon the Atlantic coast. Under this state of things, it is not to be expected that the examination of pilots and engineers would be very thorough or frequent, and such I understand has been the fact. But as soon as the importance of the matter is brought to the attention of congress, inspectors will doubtless be provided for this district, and this difficulty will be obviated. The act only so far abrogates the state system as to require that a steam vessel, carrying passengers, shall be under charge of a pilot licensed by its authority. The compensation of pilots, the manner and times of offering their services, still remain, until congress sees proper to provide otherwise, legitimate subjects of state legislation. The libellant, although he first offered his services to the Panama, as she was outward bound, is not entitled to recover his claim for half-pilotage. The law of the state under which he claims, as to the necessary qualifications for piloting the Panama, was abrogated by the act of congress. The libellant was prohibited under a penalty of one hundred dollars from being employed on her as a pilot and the master in the like sum from employing him.

Decree. that the libel be dismissed, and that the claimants recover of the libellant and his sureties their costs.