State *v.* Wordin.

THE STATE *vs.* NATHANIEL E. WORDIN.

Fairfield Co., Oct. T., 1887.   PARK, C. J., PARDEE, LOOMIS, BEARDSLEY
                    and STODDARD, Js.

The common council of a city had power by the city charter to make such
    ordinances as should be deemed necessary and proper for the protection
    of the health of the citizens, and passed an ordinance requiring every
    physician having a patient within the city sick with an infectious dis-
    ease, to forthwith report the fact to the mayor or to the clerk of the
    board of health, with the name of the patient and the street and num-
    ber of the house, under a penalty not exceeding fifty dollars.   Held
    that the ordinance was not invalid as conflicting with the constitutional
    rights of the citizen and that the legislature had power to authorize its
    enactment by the common council.

[Argued October 26th—decided December 1st, 1887.]

PROSECUTION for a violation of an ordinance of the city
of Bridgeport; brought before the City Court of that city,
and, by appeal of the defendant, to the Superior Court in
Fairfield County, and in that court tried to the jury, upon
the plea of "not guilty," before *Sanford, J.*   The jury re-
turned a verdict of "guilty" and the defendant appealed
for error in the charge of the court.   The case is fully stated
in the opinion.

*G. W. Wheeler*, with whom was *H. J. Curtis*, for the ap-
pellant.

*First.* The ordinance is against sec. 9 of art. 3 of the
state constitution, which forbids that any person should be
deprived of his life, liberty or property without due course
of law.

1. The ordinance requires of each physician the perform-
ance of a positive duty; the performance of that duty takes
the time of the professional man; prevents him from fol-
lowing his usual avocation, and demands of him a certain
amount of labor, namely, the making of certain reports.
*Property is anything which has exchangeable value.*   Labor

has exchangeable value and therefore labor is property, and has been so regarded from early times by political economists and jurists. Smith's Wealth of Nations, bk. 1, ch. 10, part 2; *Slaughter House Cases*, 16 Wall., 36; *Parrot's Case*, 6 Sawyer, 374; *Campbell* v. *Holt*, 115 U. S. R., 630; Cooley Const. Lim., ch. 11, p. 393. DAVIS, P. J., in passing upon the tenement house act, says: "Without citing further authorities, it may be stated as a legal and political axiom, that since the great laboring masses of our country have little or no property but their labor, and the free right to employ it to their own best interest and advantage, it must be considered that the constitutional inhibition against all invasions of property without due process of law, was as fully intended to embrace and protect that property as any of the accumulations it may have gained." *In re Jacobs*, 33 Hun, 375; affirming 98 N. York, 98. Compulsory reports under this ordinance from each physician are exactions of labor and therefore deprivations of property. These reports compel labor from and take the time of the physician. This labor and this time are his property to do with as he will. He may sell it or he may give it, but no power, whether of the individual or of the government, can touch it, for it is as sacred in the eye of the law as the privacy of his house. *Wynehamer* v. *People*, 13 N. York, 386; 1 Black. Comm., 138.

2. Compulsory labor is an infringement upon the liberty of the physician. So long as the municipality compels any of its citizens to refrain from their usual and lawful avocations, just so long is it placing an illegal restriction upon their freedom of action and depriving them of the full measure of their liberty. 2 Webster's Works, 393. No man is free, no man enjoys legal liberty, when he is compelled to suffer the wrong of having any of his time mortgaged to another against his own wish and without consideration to himself. It matters not whether the deprivation be for a longer or a shorter time, whether it be great or small. EARL, J., in the tenement case *supra*, says:—" Liberty, in its broad sense as understood in this country, means the

right, not only of freedom from actual servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. All laws, therefore, which impair or trammel these rights are infringements upon his fundamental rights of liberty, which are under constitutional protection."

3. No man can be deprived of his property or his liberty without due course of law. By "the law of the land," says Webster in the *Dartmouth College Case*, "is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial." This ordinance proposes to "forthwith" require of physicians certain reports. If this be a taking of property and restrictive of liberty, where is the judicial inquiry before the arbitrary exercise of power? Where the opportunity to be heard? Where the judgment rendered only after trial? There is none. *The law of the land cannot mean this trial. Wynehamer* v. *People*, 13 N. York, 393. We are forced to the conclusion that *this ordinance takes the property and restricts the liberty of the physician without due course of law, and is therefore void.*

*Second.* Can this ordinance be justified as a legitimate exercise of the police power of government? It is hard to determine what the police power of government is. An eminent jurist has said that it were better to decide each instance as it arises, and thus by a process of judicial exclusion and inclusion arrive at a satisfactory basis for a definition. Yet it is certain that there is found in the authorities an underlying principle by which must be tested each exercise of this power. Mr. Cooley, (Const. Lim., 572,) says:—
"The police of a state in a comprehensive sense embraces its whole system of internal regulation, by which the state seeks not only to preserve the public order and to prevent offenses against the state, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a

conflict of rights, and to insure to each the uninterrupted
enjoyment of his own so far as is reasonably consistent with
a like enjoyment of the rights of others." This determines
that the state may restrain or prohibit all things harmful to
the welfare of society, guaranteeing to each person the unin-
terrupted enjoyment of his own so far as is reasonably con-
sistent with a like enjoyment of the rights of others. We
turn to the ordinance. It burdens those who seek by pro-
fessional skill to rid the community of whatever may be
harmful to it. There is no possible connection between the
harmful cause and those who bear the burden; they did not
create it, nor own it, nor continue it. They are not using
their own so as to deny to others the proper enjoyment of
their own. The arguments usual in cases like the one under
consideration are based on the assumption that the sovereign
in exercising the police power of the state is absolutely un-
fettered with regard to all rights of property. *New Orleans*
v. *Tammany Water Works*, 4 Woods, 143. Yet the charter
of the city of Bridgeport decrees that all ordinances shall
be in harmony with state and federal law. We have at-
tempted to discuss the infringement by this ordinance of
our state and federal constitutions. The courts say these
instruments were not designed to interfere with the police
power of government, meaning thereby the rightful exercise
of this power. That rightful exercise must in each instance
have beneath and behind it some underlying principle, guar-
anteeing protection to community and citizen alike, and
demonstrating by itself the validity of the law which it
sustains. An examination of the authorities will demon-
strate that courts have uniformly squared their decisions
with the principle that the authority for the exercise of the
police power is found in the enforcement by government of
the maxim *sic utere tuo ut alienum non laedas*. " The police
power of government, as understood in the constitutional
law of the United States, is simply the power of the gov-
ernment to establish provision for the enforcement of this
common as well as civil law maxim." Tiedeman on Lim.
of Police Power, p. 4, sec. 1; 2 Kent's Comm., 340. In

deciding an ordinance forbidding a railroad to use steam to propel its cars in certain streets, to be valid, WAITE, C. J., said :—" Such prohibitions clearly rest upon the maxim *sic utere tuo ut alienum non laedas*, which lies at the foundation of the police power." *Railroad Co.* v. *Richmond*, 96 U. S. R., 527 ; *Commonwealth* v. *Alger*, 7 Cush., 84 ; *Thorpe* v. *Railroad Co.*, 27 Verm., 149. And in *State* v. *Sargeant*, 45 Conn., 374, in deciding that the state might establish harbor lines, PARDEE, J., says :—" The public do not propose in any manner to appropriate or use any right of the respondents in the soil of the shore, but only to guard against any invasion by them of the permanent right of the public to navigate the waters over it ; to enforce against them the maxim *sic utere tuo ut alienum non laedas*. It is only the exercise of the police or supervisory power vested in the legislature." For the application of the same principle, see *Eastman* v. *State*, 7 West. Rep., 421, (Ind. S. C., Jan., 1887) ; *Haedet* v. *State*, 105 Ind., 250 ; Cooley's Const. Lim., 577 ; *Munn* v. *Ill.*, 94 U. S. R., 113 ; *R. R. Co.* v. *Husen*, 95 id., 474 ; *Goddard, Petitioner*, 16 Pick., 510 ; *Waterman* v. *Mayo*, 109 Mass., 319 ; *In re Cheeseborough*, 78 N. York, 237 ; *Bertholf* v. *O'Reilly*, 74 id., 514 ; *Knoxville* v. *Bird*, 12 Lea (Tenn.,) 175 ; *People* v. *R. R. Co.*, 9 Mich., 307 ; *State* v. *Court of Com. Pleas*, 7 Verm., 77. An examination of the cases wherein the police power has been invoked in regulation of person or property discloses that a few are of the prohibitory kind, but that the greater part are regulations of a preventive or restrictive kind. It is as Jeremy Bentham wrote :—" Police is, in general, a system of precaution, either for the prevention of crimes or calamities," etc. When slaughter houses, the liquor traffic, selling of explosives, pawnshops, use of cemeteries, clearing of sidewalks, are regulated by positive enactment, the state has found that the public welfare demands that such property and such business be regulated and supervised, to the end that no person may employ his own to the detriment of others. Let us look at the ordinance in dispute. It concerns those engaged in the practice of medicine. The public have an in-

terest in the skillful and faithful performance of this pursuit, they may regulate it whenever it has proved or may prove dangerous to the community. This can happen solely from the incompetence of practitioners. A proper regulation would tend to exclude the unskillful and the incompetent. This ordinance is no regulation of the business of the physician. Regulation implies present or prospective wrongdoing or wrongacting. This ordinance does not prevent either; it is not in force for the reason that the physician is using his own to the injury of others. We submit that each exercise of the police power can be sustained only upon the theory and fact that some person or persons are misusing their own to the injury of others. Further, the majority of instances wherein the police power has been sustained are those of precaution, prevention and prohibition. The case at bar differs; it is not prohibiting *this*, but commanding *that*, namely, the physician to make certain reports based upon his own professional knowledge. It is the imposition of a positive burden upon a particular class. Instances of the police power imposing hostile burdens are rare and when sustained are found to stand not only upon the doctrine that a man's own must not injure another's but also because the positive burden carries with it a peculiar benefit or advantage to the burdened unshared by the public. In the quarantine cases (*R. R. & Steamship Co.* v. *Louisiana,* 118 U. S. R., 455,) the state statute compelled each vessel entering the harbor of New Orleans to submit to examination under the state quarantine system and pay a fee devoted to the maintenance of this system. Here was the imposition of a positive burden, the taking of private property for public use. Where is the justification? The system benefits the whole state, yet the vessel obtains from it a peculiar and especial benefit in which the people at large cannot share. As Mr. Justice MILLER said (p. 458)—"That the vessel itself has the primary and deepest interest in the examination it is easy to see. It is obviously to her interest, in the pursuit of her business, that she enter the city and depart from it free from the suspicion which at certain times attaches to all

vessels coming from the Gulf. This she obtains by the examination and can obtain in no other way." In *City of Boston* v. *Shaw*, 1 Met., 131, a by-law requiring each person using a common sewer to pay a just proportion of the expense of its construction was sustained, because " the right and privilege would become appurtenant to the several lots, and their value would thereby be increased." *Paxson* v. *Sweet*, 13 N. Jer. Law., 190. The leading case upon this subject is *Goddard, Petitioner*, 16 Pick., 504. There the validity of an ordinance requiring lot owners within certain limits to keep the sidewalks fronting their property free from snow, was established. SHAW, C. J. said :—" If this were an arbitrary selection of a class of citizens the objection would have a greater weight. But suppose there is a class of citizens who will themselves commonly derive a benefit from the performance of some public duty, we can see no inequality in requiring that all those who will derive such benefit shall by a general and equal law be required to do it. Supposing a by-law should require every inhabitant who keeps a cart, truck, or other team, or a coach or other carriage, to turn out or send a man with one or more horses, after each heavy fall of snow, to assist in leveling it. *Although other citizens would derive a benefit, yet as these derive some peculiar benefit, accompanied with the ability, I can at present perceive no valid objection to a by-law requiring it on the ground of inequality.* And it appears to us the case before us is similar. Although the sidewalk is part of the public street, and the public have an easement in it, *yet the adjacent occupant often is the owner of the fee, and generally has some peculiar interest in it and benefit from it, distinct from that which he enjoys in common with the rest of the community.* * * * The owners and occupiers of house lots and other real estate therefore have an interest in the performance of this duty peculiar and somewhat distinct from that of the rest of the community." Cooley on Taxation, 588–591 ; *Woodbridge* v. *Detroit*, 8 Mich., 274 ; *Hate* v. *Newark*, 8 Verm., 423 ; *Mayor* v. *Maybury*, 6 Hun, 371 ; *Palmer* v. *Way*, 6 Col., 107 ; *Buffalo* v. *Webster*, 10 Wend., 100. The guiding and

controlling principle of these cases is, that whenever in the exercise of the police power a burden of benefit to a whole community is placed upon a portion of that community, there must be peculiar and especial benefit to the portion of the community so burdened. Of the ordinance in dispute we ask what peculiar and especial benefit inures to that portion of the community, namely, the physicians, upon whom is cast the burden of reporting cases of infectious diseases? ·The ordinance discloses none, the finding none, there is none. The limit to the exercise of the police power is the law of the land. We have demonstrated that the law of the land denies validity to any ordinance not founded on one or both of these principles:—1. That every man must use his own so as not to injure another. 2. That all burdens of public benefit falling upon a class must give to the burdened a special benefit unshared by the public. The ordinance in question is founded upon no principle. If the state limited the practice of medicine to those admitted to practice by certificate upon due examination, there might be some little foundation for a claim that the state gave to this class a peculiar benefit and was now exacting its tribute for benefits given. The practice of medicine is not privileged; all may engage in it; but in Connecticut we impose no regulation of qualification upon the practitioner. The smith may leave his anvil to-day and on the morrow announce himself a physician and surgeon. Nowhere is there a possible consideration to sustain the peculiar burden of the ordinance. An examination of the statutes of the states of the Union in whose limits statutes or ordinances similar to the one in dispute are existent, will disclose that, with one or two exceptions, these states limit the number of physicians by prescribing certain qualifications, the aim being to exclude incompetents from practice. Here then is a *quid pro quo* for placing a public burden upon a limited few, bringing these instances within the principle of *Goddard, Petitioner*. In some states, as though anticipating this very point, we find recent legislatures granting a fee for each report made. New Jersey Public Acts of 1883, ch. 105, sec. 7;

Michigan Acts of 1883, p: 7, sec. 44. And in our own state, in a police regulation very similar to the regulation in question, the state provides compensation for each reported case of birth or death. Acts of 1884, ch. 94. We believe that in no state can be found an ordinance similar to the one in question, where the state does not prescribe qualifications to the practice of medicine.

*S. Fessenden* and *J. C. Chamberlain*, for the State.

PARDEE, J. The legislature in the charter granted to the city of Bridgeport conferred power upon the court of common council to establish ordinances "relative to the cleanliness and health of the city;" also, "relative to any and all other subjects that shall be deemed necessary and proper for the protection and preservation of the health, property and lives of the citizens." Under the power thus given the court of common council ordained that " every physician, or person acting as such, who shall have any patient within the limits of said city sick with small-pox or varioloid or other infectious or pestilential disease, shall forthwith report the fact to the mayor, or to the clerk of the board of health, together with the name of such patient and the street and number of the house where such patient is treated; and in default of so doing shall forfeit and pay not exceeding fifty dollars for each and every such offense."

The complaint charged that on the first day of December, 1886, the defendant, a physician practicing in said city, had a patient within the limits thereof sick of a contagious and infectious disease known as diphtheria, of which fact he neglected to make any report to any person. Upon plea of not guilty there was a verdict of guilty, and a judgment that he should pay a fine and costs.

The defendant appealed, assigning as reason of appeal that the court refused to charge the jury in accordance with the following written request, namely:—" That the ordinance in question is inoperative and void—1st. Because it is repugnant to and inconsistent with section nine of article first of

the constitution of Connecticut, and the fifth and fourteenth amendments to the constitution of the United States, inasmuch as it takes the time of and compels work from each practicing physician, and hence arbitrarily deprives him of his property without due process of law.   2d. Because it is repugnant to and.inconsistent with section nine of article first of the constitution of Connecticut, and the fifth and fourteenth amendments to the constitution of the United States, inasmuch as it hinders and prevents the usual avocation of the physician, deprives him of his time, and restrains his lawful movements, and therefore deprives him of his liberty.   3d. Because it is repugnant to and inconsistent with section eleven of article first· of the constitution of Connecticut, and the fifth and fourteenth amendments to the constitution of the United States, inasmuch as it takes private property for public use, without making compensation therefor.   4th. Because it is repugnant to and inconsistent with the fourteenth amendment to the United States constitution, inasmuch as it imposes a burden upon a class, namely, physicians, and gives them no compensation therefor, and places no corresponding burden upon the rest of the public.   5th. Because it imposes a special burden for the public benefit upon a class, which burden is of no peculiar or special benefit to the class bearing the burden. 6th. Because it is repugnant to and inconsistent with the thirteenth amendment ,to the constitution of the United States, inasmuch as it forces the physician to labor for the benefit of the public without compensation and thus imposes a form of servitude.   7th. Because it is in contravention of the general law of the state and the United States, inasmuch as it takes private property for public use without making compensation, restrains the liberty of the citizen, and imposes a special burden·upon a class without giving it some peculiar and special benefit.   8th. Because it is contrary to the principles of the common law and repugnant to the principles of fundamental right and natural justice, inasmuch as it takes private property for public use without making compensation, restrains the liberty of the citizen,

State *v.* Wordin.

and imposes a special burden upon a class without giving it some peculiar and special benefit. 9th. Because it is unjust and unreasonable, inasmuch as it takes professional knowledge for which it pays nothing; deprives the physician of his time, which is his liberty, and compels the performance of labor, which is a taking of his property; brings him into unpleasantness with his patients and thus injures his business; interferes with his business; puts upon a class a public burden and hence is class legislation; and imposes a burden on physicians alone which might have been placed upon each householder, and for these reasons is an undue interference with a lawful business."

In conferring authority upon the legislature of the city to pass the ordinance, the legislature of the state was in the performance of its duty and in the exercise of its power to protect its citizens from exposure to contagious, fatal diseases.

Of absolute necessity this power inheres in every organized community; otherwise there would be only organized suicide. It takes unwritten precedence of all provisions for the protection of rights of property, and includes the right to require as much of the services or property of each as may be necessary to the preservation of the lives of all, without provision for payment therefor. The people of this state have not by the constitution parted with any portion of this power which was in them, nor have they put any limitation upon themselves as to the exercise of it. It is now as fully in the legislature as at the beginning it was in the people.

The purpose of assembling in communities being the promotion of the welfare of all, the legislature is under obligation to place the resulting burdens as equally as possible. It is not to subject one to requirements so much more burdensome than those placed upon others as to violate the great principles of common rights, the fundamental principles and purposes of the social compact, or shock the sense of justice. To this test all laws may be subjected.

Tried by this, is an ordinance which requires one to lose

a small portion of his time that the lives of many may be saved, offensive to the constitution ? An ordinance requiring the person who in the night season should first discover a dwelling-house in the city to be on fire, to turn aside and arouse the inmates and sound the alarm without compensation, would not shock any one. Nor, we think, does one requiring the person who first discovers in a crowded street the presence of a contagious, fatal disease, to notify, without compensation, the official charged with the duty of preserving health and protecting life therein. If to compel this gratuitous service is to violate the principles of the social compact, it would be better to dissolve and reorganize.

The constitution of the United States protects the individual from the taking of his property without due process of law; from the taking for public use without just compensation ; from slavery or involuntary servitude ; and secures to him the equal protection of the law. In effect, that neither life, liberty nor property may be taken except upon judicial determination made upon hearing, according to established rules of justice and precedents of courts, applied equally to all ; that neither service nor property may be taken from any one for the pecuniary advantage of the public except upon just compensation ascertained upon hearing in due process of law; that no one may be compelled to render service to another ; and that the eye of the law shall not see any distinction of race or color. But these provisions place no limitation upon the power of the legislature of this state to require gratuitous service from one member of the community in the protection of the lives of all, other than that which would have been equally upon it in their absence, namely, that it shall not violate the fundamental principles and purposes of the social compact.

These provisions, and our legislative enactments for protection of life from fatal pestilence are on different planes ; they move upon parallel lines ; they never conflict.

Courts in many instances have approved of laws forbidding the use of buildings for specific purposes ; forbidding individuals from exercising certain trades within specified

limits ; restricting them as to the manner in which they shall carry on certain kinds of business ; all this upon the principle that no one may be permitted so to use his property as to injure the health or peril the life of another.

In case of fires in cities the public authorities have been protected in the destruction of a building, for the purpose of breaking the combustible chain of communication, without compensation to the owner, because his property had become a source of danger to that of others, although without fault of his. Individuals are compelled to suffer a modified imprisonment because some person afflicted with a contagious, fatal disease has, without their knowledge, come into their presence and made them possible means of communicating it to others. The state may compel a citizen to resist invasion ; to assist the sheriff in the protection of life, in the enforcement of process and in the preservation of public peace. Under these circumstances, the constitutional right to compensation for service stands in abeyance.

Equally so when the matter in hand is the defense of the public from a coming fatal pestilence. In these several instances, not because the individual is using either his property or his time to the injury of any other ; not because he is a source of danger to any other ; but for this equally well-grounded reason, namely, that he alone happens to be in a position where he could serve the community in an emergency involving life ; and in such case it is the duty of the state to make use of him as its most effective instrument.

In his concession that the ordinance would be valid in the ravages of pestilence, under presence of an overwhelming necessity to prevent public calamity, the defendant concedes the whole case. An ordinance of this character must be intensely practical; a proper regard for human life demands that a contagious, fatal disease shall be barred rather than driven out.

The inequality of burden of which the defendant complains is only in seeming. Persons offering their services to the public as healers of disease and requiring pecuniary

compensation therefor, thereby assert their ability to detect the presence of it when the great mass of the people cannot. The people accede to the truth of their assertion, and in the matter of life surrender themselves to their keeping. Of course an ordinance in the interest of life must detect the presence of a fatal contagious disease at the earliest possible moment. Therefore with impartial action it compels that member of the community who is the first to have sight and knowledge of it, to give note of warning to others from whom its presence is hidden. It would be idle to require, indeed there would be danger in accepting, this service from those who cannot see or do not know. The burden is made to rest upon every member of the only class which is in a condition to contribute anything to the accomplishment of the purpose of the ordinance.

There is no error in the judgment complained of.

In this opinion the other judges concurred.