Davis, J.
The defendant in error was indicted for an alleged violation of an act, entitled “An act to establish a Bureau of Vital Statistics and to provide for the prompt and’permanent registration of all births and deaths occurring within the state *350 of Ohio,” 99 Ohio Laws, 296. A demurrer to the indictment was overruled by the common pleas court and the defendant was put upon trial, found guilty and sentenced. The circuit court reversed the judgment, for error in rejecting certain testimony offered by the defendant and the state prosecutes error to reverse the judgment of the circuit court and to affirm the judgment of-the court of common pleas.
The attorney general and his associates insist that the act referred to is a constitutional exercise of legislative power and that the evidence which was rejected in the trial court was properly held to be inadmissible; while the defendant still maintains that the proffered evidence was admissible and that the act under which the indictment was framed is unconstitutional. We shall review the latter contention only.
That the general grant in the constitution of the legislative power, includes police power is conceded; and that the registration of births, deaths, marriages and the like may be included in a proper exercise of the police power is also conceded. But it is disputed that, while requiring the registration of such facts as may .naturally and readily come to the knowledge of persons present at a birth, death or marriage, the state may compel such persons to inquire for, investigate, and report upon, certain collateral matters which may be interesting and of possible value to a bureau of statistics, and that too without substantial compensation. We understand the counsel for the state to maintain the affirmative all along the line of this contention.
*351 The police power is inherent in sovereignty; and its exercise is justified by the necessity of the occasion. Its foundation is the right and duty of the government to provide for the common welfare of the governed. It is tersely expressed in the maxim, “Salus populi suprema lex.” While, therefore, a broad discretion is given to the legislature to provide for the general welfare, it, necessarily, is not an arbitrary or unlimited discretion; for if it were beyond judicial control or review, it would amount to a practical abrogation of all constitutional guaranties of personal rights and the undefined boundaries of legislative power could be extended so as to authorize the worst and most irresponsible form of despotism, a legislative despotism conducted in the name of the people. Hence it has been held, not only in this state, but in a great number of cases both in the federal and state courts, that it is within the judicial power to declare void an unnecessary or unreasonable exercise of police power. This rule was approved and applied in Phillips v. State, 77 Ohio St., 214, “To justify the state in thus interposing its authority in behalf of the public it must appear, first, that the interests of the, public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under guise of protecting, arbitrarily interfere with private business or impose ■ unusual and unnecessary restrictions upon lawful occupations. In other words, its determination of- what is a proper exercise of the *352 police power is not final or conclusive, but is subject to the supervision of the courts.” Lawton v. Steele, 152 U. S., 133. See also numerous cases cited in 22 Am. & Eng. Enc. Law (2 ed.), 939.
We need not-inquire whether the state may not require a physician or midwife to report to the proper authority, for registration, the fact of a birth which has come under his or her observation, first, because it is conceded that it may do so, and, second, because it obviously has some relation to the public welfare and it can not be very burdensome to comply with such regulation. But this statute goes much further. It imposes upon the physician or midwife the duty of investigating and certifying as to certain facts which would not necessarily or naturally come within the knowledge of the attending physician or midwife,, viz: whether the birth was legitimate or illegitimate, and, except in case of illegitimacy, the full name, residence, color or race, birthplace, age and occupation of the father; also the maiden name in full, residence, color or race, birthplace, age and occupation of the mother; likewise the number of this child of the mother, and the number of living children of the mother. It is further provided that no certificate shall be held to be complete and correct which does not supply all of the items of information called for therein, or satisfactorily account for their omission; and that the physician or midwife who shall neglect or refuse to. file a proper certificate of birth with the local registrar,within the time required by the act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined, etc. In short, a professional *353 attendant at a birth is required to enter upon an inquiry as to non-professional questions, to supply information to, it may be, a non-professional official, “clothed with a little brief authority,” in relation to matters which perhaps are interesting as vital statistics, but as to which it requires more than appears in this statute or in the arguments in this case, to show that they are necessary or even closely related to the public safety, the public morals or the public welfare: an inquiry too which could be just as well and more appropriately conducted, reported upon and certified to, by the local registrar, or a township assessor, or a census taker.
The physician or midwife is compelled, under the penalties of the statute, to institute and carry out the necessary investigation and to “supply all of the information called for” without compensation. The contention is made on the part of the state that statutes which impose the duty of making such report or certificate are not unconstitutional because they do not provide for compensation to physicians. While we do not regard this point as decisive 'of the present case, yet we are not prepared to yield unqualified assent to the proposition thus broadly stated. None of the cases cited for the state in that connection appears to have been carefully considered, except State v. Warden, 56 Conn., 216. In one of them indeed, Robinson, Clerk, v. Hamilton, 60 Ia., 134, it is frankly said: “We have not been favored with an argument on behalf of the defendant, and are, therefore, not informed of the grounds upon which the statute in question was assailed in the court below and is claimed to be unconstitutional. It cannot be *354 expected' that we shall consider arguments of which we have not heard, or that we will imagine objections and discuss them.” Besides the case does not seem to go further than the defendant in this case concedes the law to be. The Connecticut case referred to, • after a statement of the guaranties of personal liberty contained in the Constitution of the United States, contains the following language: “But these provisions place no limitation upon the power of the legislature of this state to require gratuitous service from one member of the community in the protection of the lives of all, other than that which would have been equally upon it in their absence, namely, that it shall not violate fundamental principles and purposes of the social compact.” This language should be read in the light of the facts of that case; but, assuming that it correctly states the law in its general application, there is grave reason to doubt whether it is sound law in this jurisdiction, owing do specific provisions of the Ordinance of 1787.
' The purview of that famous act of congress is expréssly “for the government of the territory of the United States northwest of the river Ohio.” The first twelve sections of the ordinance obviously provided for the temporary government of the territory until it should be divided and organized into states. Then follows something of more enduring interest. We quote.
“And for extending the fundamental principles of civil and religious liberty, which form the basis whereon these republics, their laws and constitutions, are erected; to fix and establish those principles as the basis of all laws, constitutions, and governments, which forever hereafter shall be *355 formed in the said territory; to provide, also, for the establishment of states, and permanent government therein, and for their admission to a share in the federal councils on an equal footing with the original states, at as early periods as may be consistent with the general interest: It is hereby ordained and declared, by the-authority aforesaid, that the following articles shall be considered as articles of compact, between the original states and the people and states in the said territory, and forever remain unalterable, unless by common consent, to-wit:” Then follow the several articles of compact. We quote from only two of them. It is provided in Article II that, “No man shall be deprived of his liberty or property, but by the judgment of his peers, or the law of the land, and should the public exigencies make it necessary, for the common preservation, to take any person’s ■property, or to demand his particular services, full compensation shall be made for the same.”
Perhaps it may be said that the adoption of a constitution by the people of Ohio superseded the Ordinance of 1787, and that the constitution of Ohio contains no such provision as that which w<“ have quoted from Article II of the Ordinance of 1787. We recur again to the “articles of compact” and quote from Article V: “And whenever any of the said states shall have sixty thousand free inhabitants therein, such state shall be admitted, by its delegates, into the Congress of the United States, on an equal footing with the original states, in all respects whatever: Provided, The constitution and government, so to be formed, shall be republican, and in conformity to the principles contained in these articles.” If our constitution, in *356 stead of creating a republican form of government for the state, had provided a pure democracy, a government directly by the people, and, so framed, it had been accepted by the president and congress of the United States, there might have been some reason for the claim that, in that respect, the compact which was -to “remain forever unaltered, unless by common consent” had been repealed by implication; yet even under such circumstances a conclusive presumption would not be raised that the compact had been altered, without the common consent of all the parties thereto. But if the convention which prepared our constitution had omitted from the Bill of Rights, the famous interdiction against slavery, contained in Article VI of the ordinance, would that have justified the conclusion that the compact was altered and that the existence of slavery in Ohio would be constitutional? Or, to put the question in another form, if our constitution contained nothing whatever in regard to the privilege of the writ of habeas corpus, or to trial by jury, or to proportional representation of the people in the legislature, or' to the prohibition of cruel and unusual punishments, it could not be justly inferred that the great compact had been altered and that these privileges and guaranties had been subtracted from the rights of the citizens, and were not included among the rights reserved by the people (Const, of Ohio, Art. I., Sec. 20) ; because there would have been nothing in the constitution which was inconsistent with the ordinance and the declared purpose thereof “to fix 'and establish those principles as the basis of all laws, constitutions, and governments, which forever hereafter shall be formed in the said terri *357 tory,” and that these “articles shall be considered as articles of compact between the original states and the people and states in the said territory, and forever remain unalterable, unless by common consent.”
In Hogg v. Manufacturing Co., 5 Ohio Rep., 410, at page 416, Hitchcock, J., speaking of a clause in Article IV, of the ordinance, said, “This portion of the Ordinance of 1787, is as much obligatory upon the state of Ohio as our own constitution. In truth it is more so; for the constitution may be altered by the people of the state, while this cannot be altered without the assent both of the people of this state and of the United States through, their representatives. It is an article of compact, and, until we assume the principle that the sovereign power of the state is not bound by contract, this clause must be considered obligatory.” And in Hutchinson v. Thompson, 9 Ohio R., 52, at page 62, Grimke, J., remarked: “But when application for admission into the Union was made by the people inhabiting the eastern part of the territory, modifications in several parts of the ordinance were asked for, and they were granted by the United States as one party, to the state as the other. This seems to show that the people of Ohio have, so far, treated the articles of compact as of perpetual obligation. The alterations proposed were with a view to the immediate formation of a state constitution, and were of no importance if the states should have a right to annul the ordinance the moment it assumed that condition.”
Similar language is found in the opinion in Cochran’s Heirs v. Loring, 17 Ohio R., 409, 424- *358 425, and the foregoing quotations remain as the unmodified expressions of this court upon this subject.
We are not unaware of various dicta which have appeared from time to time in opinions by learned justices of the supreme court of the United States, beginning with Pollard’s Lessee v. Hagan, 3 How., 212, and Permoli v. First Municipality, 3 How., 589, 616; Strader v. Graham, 10 How., 82. But it requires no acute analysis to differentiate those cases and to show that they do not go very thoroughly into the question whether the Ordinance of 1787 can be superseded otherwise than by the “common consent” of the parties to the compact as required by the terms of the ordinance, or whether such “common consent” ever has been given; and, giving the fullest effect that can be claimed from those remarks by the distinguished judges, it is obvious that they ignore the distinction between a mere act of congress which may be repealed or superseded by subsequent acts, and. a solemn and formal “compact,” in the nature of a treaty as it were, between the proprietary states and the people and states of the territory which was subsequently to be erected into several states of this Union. They ignore, moreover, the fact that the compact, on the good faith of which the original proprietors ceded this territory to the United States, expressly declared that the principles declared therein shall be the basis of “all laws, constitutions and governments which forever hereafter shall be formed in the said territory;” and at best these declarations rest on no stronger foundation than the provision of the compact itself, namely, that a state with constitutional limitations as pro *359 vided, “shall be admitted, by its delegates, into the Congress of the United States, on an equal footing with the original states, in all respects whatever.” See cases above cited and Escanaba Co. v. Chicago, 107 U. S., 678, 688-689; Van Brocklin v. Tennessee, 117 U. S., 151, 159; Sands v. Manistee River Improvement Co., 123 U. S., 288, 295-296; Willamette Iron Bridge Co. v. Hatch, 125 U. S., 1, 9-10. Whatever that clause may mean, it certainly does not mean that all state constitutions shall be, or are, alike, nor, that a new state erected in the Northwest Territory, shall be understood to surrender all the guaranties of the compact 'as a condition of admission as a state.
We have thus briefly .indicated the reasons for our belief, that the Great Charter of the Northwest Territory is still under, and above, and before, all laws or constitutions which have yet been made in the states which are parts of that territory; and that under its guaranties the state has not the right to draft a citizen into particular service with- ' out substantial compensation. At least, it is clear to us that the provisions of this statute which require a professional man to search out non-professional information and certify it to state authorities, is unnecessary, unreasonable and arbitrary, and is not, therefore, a valid exercise of police power. The demurrer to the indictment should have been sustained and therefore the judgment of the circuit court reversing the judgment of the court of common pleas is

Affirmed and defendant discharged.

Speak, C. J., Spiauck, Price, Johnson and Donapiue, JJ., concur.