Jamieson *v.* The Indiana Natural Gas and Oil Company *et al.*

No. 16,106.

## JAMIESON *v.* THE INDIANA NATURAL GAS AND OIL COMPANY ET AL.

CONSTITUTIONAL LAW.—*Police Power.—Needful Regulations.—Legislature.*—Where a subject is within the police power of the State, the question as to what regulations are proper and needful is one for legislative consideration and decision.

SAME.—*Legislature.—Usurpation of Power.—Presumption.*—Courts will not presume that the Legislature has usurped power or disregarded the organic law. A party who asserts that the Legislature has usurped power or has violated the Constitution must affirmatively and clearly establish his position.

NATURAL GAS.—*Qualities of.—Judicial Knowledge.*—The courts will take judicial notice of the qualities of natural gas, and that it is in a high degree inflammable and explosive.

SAME—*Police Regulation.*—Natural gas is so dangerous that its use may be made the subject of a police regulation.

SAME.—*Transportation Through Pipes.—Pressure.—Act of March 4th, 1891, Regulating.—Validity of.*—The act of March 4th, 1891 (Acts 1891, p. 89), regulating the mode of procuring, transporting and using natural gas, which prohibits the use of more than the natural pressure or an artificial pressure exceeding three hundred pounds to the square inch, is a valid exercise of the police power, and is constitutional.

SAME.—*Regulation of Use of Property.—Vested Rights.*—Said act is but a regulation of the use of property, and is not a taking of property without compensation, nor is it an interference with vested rights or in violation of the provision of the Federal Constitution that no person shall be deprived of property by any State without due process of law.

SAME.—*Can not be Made Subject of General Commerce.*—Natural gas can not be made the subject of general commerce between the States because of its local nature and intrinsic qualities, and it can not, so far as local safety is concerned, be made the subject of uniform Federal legislation, but is a legitimate subject for reasonable police regulation.

SAME.—*Interstate Commerce.—Act of March 4th, 1891, not a Regulation of.—Case Distinguished.*—Natural gas, because of its local characteristics and peculiarities, and its inherent dangerous qualities, is a proper subject for State legislation, and the act regulating the pressure to be employed in its transportation through pipes, while it affects a commercial commodity, is but an exercise of the police power—a regulation of the mode of using property—and is not a regulation of interstate commerce

| | |
|---|---|
| 128 | 555 |
| 129 | 474 |
| 128 | 555 |
| 130 | 4 |
| 130 | 73 |
| 128 | 555 |
| 131 | 402 |
| 128 | 555 |
| 134 | 254 |
| 135 | 52 |
| 128 | 555 |
| 138 | 401 |
| 128 | 555 |
| 142 | 192 |
| 128 | 555 |
| 146 | 606 |
| 147 | 628 |
| 128 | 555 |
| 151 | 267 |
| 128 | 555 |
| 155 | 475 |
| 155 | 546 |
| f155 | 568 |
| 156 | 680 |
| 128 | 555 |
| 158 | 129 |
| 128 | 555 |
| 162 | 287 |

in the constitutional sense of the term. *State, ex rel.,* v. *Indiana, etc., Co.,* 120 Ind. 575, distinguished.

OLDS, J., dissents.

From the Porter Circuit Court.

*W. D. Holt, R. N. Lamb* and *R. Hill,* for appellant.

*W. E. Niblack, A. C. Harris* and *L. Cox,* for intervenors.

*R. C. Bell, S. R. Morris, J. Morris, J. M. Barrett, F. Winter* and *J. B. Elam,* for appellees.

ELLIOTT, J.—The complaint of the appellant states these material facts : The Indiana Natural Gas and Oil Company is a corporation organized under the laws of Indiana for the purpose of drilling wells, procuring natural gas and supplying it to consumers. The appellant is a stockholder in that corporation. The Columbus Construction Company is also a corporation and is the owner of natural gas wells in many counties of this State. In June, 1890, the gas company entered into a contract with the construction company wherein it was provided that the latter company should acquire the right of way through Indiana and through Illinois to the city of Chicago ; that it should construct for the gas company, on the right of way secured, a line of pipe for the transportation of natural gas, and should furnish all necessary machinery and appliances required to obtain and convey natural gas to consumers. In consideration of the purchase of the right of way and the furnishing and construction of pipe lines, machinery and appliances, the gas company agreed to issue and deliver to the construction company capital stock to the value of one million five hundred thousand dollars, and also to issue to the construction company four million dollars of its corporate bonds, and to secure their payment by a mortgage upon its property and franchises. The construction company, proceeding under the contract, acquired a right of way as agreed, and did purchase and lay down a line of pipe for a distance of twenty miles, and distributed pipe along the right of way for a distance of forty

Jamieson *v.* The Indiana Natural Gas and Oil Company *et al.*

miles. That company has purchased and has in readiness machinery and appliances to be connected with the line of pipes, and it is able, ready and willing to perform its part of the contract. Natural gas can only be transported to Chicago by pumping and under pressure. It will be impossible to transport it to that point at a pressure which does not exceed three hundred and twenty-five pounds to the square inch. The gas company will have no other assets or property than " its plant and system, and no means whatever of paying either the principal or interest of the corporate bonds," which are to be issued to the construction company, but its only means of paying such bonds or of redeeming its capital stock will be such as are derived from " the plant and system and the revenues, tolls, income and profits to be earned thereby in the transportation and sale of natural gas in the city of Chicago, and the sole value of its stock will depend upon the right and ability of said company to engage in and carry on, by means of its natural gas plant and system, the business of transporting natural gas to Chicago and there selling the same." The " plant and system can not be put to any other commercially profitable use than that of transporting natural gas to Chicago, and can only be used to advantage and profit by the use as aforesaid of the pumping machines and other artificial devices."

The complaint sets forth at full length the act of March 4th, 1891, and in addition to the averments of the facts already outlined contains these allegations : " The Indiana Natural Gas and Oil Company, by reason of the statute aforesaid, is prohibited from transporting said gas through said pipe line at more than the natural flow and pressure, or at a pressure in excess of three hundred pounds to the square inch, or from using any artificial device to increase or maintain the natural flow of the gas, the natural gas property, and plant constructed to be furnished and delivered to the defendant as aforesaid, will be of no value for the purpose of such plant, and of little or no value for any purpose to

said defendant, and the stock and bonds of the defendant will be wasted, and said company deprived of all the means of effecting the objects and purpose of its incorporation, and be rendered entirely insolvent."

Plaintiff further avers and charges, that the statute aforesaid has made it unlawful for said defendant, or any person in said State of Indiana, to transport natural gas through said pipe line at a pressure exceeding three hundred pounds per square inch, or the natural flow and pressure of such gas, or to use in such transportation any artificial device for the purpose, or which shall have the effect of increasing, or maintaining, the natural flow and pressure of such gas.

Wherefore plaintiff avers that it has become and is illegal for either of said defendant companies to further proceed with the execution of said contract, and that the defendant the Indiana Natural Gas and Oil Company, especially, ought not to be permitted to further proceed in the execution of said contract, the performance of which will result as aforesaid in a waste and destruction of almost its entire corporate assets, and make it entirely impracticable for it to carry out the objects and purposes of its incorporation, and will also involve it in liability for the payment of heavy penalties for the violation of said statute.

Plaintiff avers that immediately upon the taking effect of said statute he demanded of the board of directors of said the Indiana Natural Gas and Oil Company that they and the said company should at once desist from any other proceedings toward executing and carrying out said contract; and that they should abandon the said enterprise of transporting natural gas by the use of artificial pressure, or pressure in excess of three hundred pounds to the square inch, or other than the natural flow and pressure of said natural gas, and that they should at once rescind and abandon the said contract, but that said board of directors refused to do so, and declared that notwithstanding said statute, and regardless of the right of this plaintiff, they would proceed to

perform fully said contract as to all the obligations of the said the Indiana Natural Gas and Oil Company thereunder, and would not abandon the said enterprise of transporting natural gas by artificial pressure in excess of the natural flow and pressure, and in excess of three hundred pounds to the square inch ; and that upon performance by said Columbus Construction Company of its part of said contract the said the Indiana Natural Gas and Oil Company would issue and deliver to said Columbus Construction Company its stock and bonds in all respects according to the terms of said contract.

Plaintiff further avers that in execution of said contract companies have already, and since the taking effect of said statute, connected their said pipe-line with certain gas wells in the county of Howard, in the State of Indiana, being wells which under said contract are to be acquired and used by said the Indiana Natural Gas and Oil Company, and by means of certain artificial devices for pumping, known as a pump, being a part of the machinery to be acquired and used by said the Indiana Natural Gas and Oil Company, did unlawfully transport the natural gas from said wells, through the said line of pipe in said county, at an artificial pressure in excess of three hundred pounds to the square inch, and in excess of the natural pressure and flow of said gas, to wit, at a pressure of four hundred and twenty pounds to the square inch, whereas the natural pressure of such gas was but, to wit, three hundred and twenty-five pounds to the square inch, and ever since have continued to, and still are so engaged in violating the provisions of said statute, whereby the said the Indiana Natural Gas and Oil Company has already incurred liability for the penalty prescribed by said statute, and will be subjected to further liability for such penalties unless the said defendant companies be enjoined as hereinafter prayed, which will result in further waste of the corporate assets and irreparable loss to this plaintiff. And plaintiff further avers that said defendant the Indiana

Natural Gas and Oil Company, unless enjoined from so do-ing, will issue to said Columbus Construction Company its bonds and stock as provided by said contract."

The trial court carried back the demurrer addressed to an answer filed by the appellees to the complaint, and gave judgment because of the insufficiency of that pleading.   The ruling of the trial court in carrying back and sustaining the demurrer to the appellant's complaint is properly challenged by a specification in the assignment of errors.

We decide the case upon the ruling adjudging the com-plaint bad, and we neither give nor intimate an opinion upon any other ruling, nor upon any other questions than such as that ruling legitimately presents.   We do not feel at liberty to consider any other questions than those designated, and upon none others do we give judgment, nor, indeed, can we decide any other questions without a departure from settled principles of procedure.

To determine what questions are legitimately presented to us, it is necessary to give a construction to the complaint which the trial court condemned, but it is only necessary to state in a very general way what we adjudge to be the nature of the complaint.   We adjudge that the complaint is to be construed as charging that the contract of the corporation, of which the appellant is a member, with the Construction Company, is incapable of performance, because it requires a violation of the act of March 4th, 1891, in this, that it pro-vides for and requires that natural gas be transported in pipes at a greater pressure than the natural pressure, or at an artificial pressure exceeding three hundred pounds to the square inch.   We may further affirm it to be our judgment upon this phase of the case that there is here no question as to the right of a stockholder to maintain such a suit as this, for no such question is presented by the briefs or arguments, and we say, still further, that the essential and controlling question presented by the ruling upon the complaint, is whether a contract which can not possibly be performed with-

out a direct violation of a statute is invalidated by the enactment.

The complaint avers, and the demurrer admits, that the performance of the contract is impossible without violating the statutory provision that no greater pressure than three hundred pounds to the square inch shall be put upon pipes used for the transportation of natural gas. We are careful to state the questions upon which we give judgment, and to declare the construction which we give to the complaint upon which those questions arise, so that there may be no misconception of our decision.

It is obvious from what we have said that the central question here presented and here to be decided is this: Is the provision of the act of March 4th, 1891, prohibiting the use of more than the natural pressure or an artificial pressure exceeding three hundred pounds to the square inch, invalid because it violates the constitution of the United States or of the State of Indiana? The validity of that provision, and of that provision alone, demands our judgment. If the Legislature of Indiana has no power to require that the pressure put upon natural gas poured into pipes shall not exceed three hundred pounds where pressure is employed, the contract between the two corporations is legal, and the complaint is bad, if it has such power, the complaint is good.

The question, as the record presents it, is one of power. With questions of policy or expediency the courts have no concern. *License Cases*, 5 How. 504; *Hedderich* v. *State*, 101 Ind. 564. If a subject is within the legislative power, the question whether that power is wisely or unwisely exercised is not a judicial one. If the power exists, then the Legislature must determine the mode of its exercise, unless the mode is prescribed by the organic law. If, to descend from a wide generalization to a narrow one, a subject is within the police power of the State, the question as to what reg-

ulations are proper and needful is one for legislative consideration and decision.   It is a cardinal principle of law that legislative discretion can not be controlled by judicial decisions, and is not subject to judicial surveillance. *Legal Tender Cases,* 12 Wall. 457 (561) ; *State, ex rel.,* v. *Haworth,* 122 Ind. 462 (467).

It must be true, therefore, that if the Legislature of Indiana has power to regulate the pressure that shall be put upon natural gas taken from wells in this State and conducted into pipes laid in the soil of the State, it has, presumptively, at least, power to determine what limit the public safety requires to be placed upon the pressure employed. The question as it comes to us is not a broad one, involving the authority of the Legislature arbitrarily to enact a law destructive of property or commercial rights under the guise of exercising police power, for here there is regulation, and not destruction.

If artificial pressure is resorted to it must, as the statute declares, not exceed three hundred pounds to the square inch, and there is nothing in the complaint justifying the inference that this is an unreasonable regulation, or one made to accomplish an unlawful object.   There are no facts presented warranting the inference that such a pressure is not reasonable or is not demanded for the public safety.

As the regulation prescribed by the statute is not one which appears on its face to be destructive of commercial interests or property rights, and as there is nothing in the complaint indicating a purpose to oppress or destroy, we can not, nor can any court, presume that there was any other purpose than the just one of regulating the use of essentially dangerous property for the good of the community.   As there is power to regulate the use of property, the measure of regulation must, to a very great extent, be within the discretion of the Legislature.   If it is true that the Legislature may not put some limit upon the pressure employed, then those who transport natural gas may, at their pleasure,

employ an unlimited degree of pressure, no matter to what extent persons and property are endangered. If it is not true that the Legislature may, in the exercise of its discretion, and within the scope of its power, determine what the pressure shall be, then no organ of government can determine it. If it be conceded that there is no legislative power to determine the question, and that it may be determined as particular controversies arise, then, the whole matter would depend upon the decision of individual judges or particular juries, and we should have acts criminal in some localities and innocent in others. But principle and authority forbid that the legislative judgment should be disregarded. As the question is presented in this case, it is power or no power. As the record stands there is no middle course, for we may not assume, in the absence of facts, that there was oppression or usurpation. It must be true that the provision of the act of 1891, regulating the pressure, is within the power of the Legislature, or it must be true that the Legislature is absolutely destitute of power over the subject.

The pleading upon which we give judgment, in this instance, does not require us to decide how far the Legislature may go in regulating the use of property not intrinsically dangerous. A distinctive and conspicuous feature of this case is that the property upon which the statute operates is dangerous and is of an extraordinary species and nature. That natural gas is a dangerous agency is a matter of common knowledge, and, hence, courts take judicial notice of that fact. We know, as the Legislature knew, and as every one knows, that natural gas is in a high degree inflammable and explosive. Surely no court would require evidence to inform it that artificial gas will ignite and explode, or that gunpowder and dynamite are intrinsically dangerous, and yet with quite as much propriety might it be claimed that without evidence a court can not know the qualities of any of the things named as to claim that a court can not take judicial notice of the qualities of natural gas. But we need

not, at this place, discuss this phase of the subject at length, for the adjudged cases very clearly show that the courts will take judicial notice of the qualities of such things as artificial gas, kerosene, gunpowder, dynamite, or the like. *Lanigan* v. *New York, etc., Co.*, 71 N. Y. 29 ; *Wood* v. *Northwestern Ins. Co.*, 46 N. Y. 421 ; *Commonwealth* v. *Peckham*, 2 Gray, 514 ; *Schlicht* v. *State*, 56 Ind. 173 ; *Frese* v. *State*, 23 Fla. 267 ; *State* v. *Hayes*, 78 Mo. 307 ; *Lohman* v. *State*, 81 Ind. 15. We may, however, add that courts take judicial notice that natural gas is so far a necessity that the right of eminent domain may be invoked by a corporation to obtain a right of way for its pipes. *State, ex rel.,* v. *Indiana, etc., Co.*, 120 Ind. 575 ; *Citizens', etc., Co.* v. *Town of Elwood*, 114 Ind. 332, and cases cited. It would be unreasonable to hold that the courts know judicially that natural gas is a public necessity so far as to warrant the exercise of the right of eminent domain, and yet hold that they do not know that it is inflammable and explosive. Knowing the one thing they must the other. We hold, without hesitation, that natural gas is so dangerous that its use may be made the subject of a police regulation. Decision after decision recognizes the principle we have stated and upholds laws regulating the use of property. *Powell* v. *Pennsylvania*, 127 U. S. 678 ; *Dent* v. *West Virginia*, 129 U. S. 114 ; *Slaughter-House Cases*, 16 Wall. 36 ; *In re Quong Wo*, 13 Fed. R. 229 ; *Yick Wo* v. *Hopkins*, 6 Sup. Ct. Rep. 1064 ; *Electric, etc., Co.* v. *City, etc., of San Francisco*, 9 R. W. Corp. Jour. 494 ; *State* v. *Wordin*, 56 Conn. 216 ; *Eastman* v. *State*, 109 Ind. 278, and authorities cited. We conclude our discussion of this point by quoting from a recent opinion of the Supreme Court of the United States : " Some occupations," said that great court, " by the noise made in their pursuit, some by the odors they engender, and some by the dangers accompanying them, require regulation as to the locality in which they shall be conducted. Some by the dangerous character of the articles used, manufactured or sold require, also, special

qualifications in the parties permitted to use, manufacture, or sell them. All this is but common knowledge." *Crowley* v. *Christensen*, 137 U. S. 86.

So far as the facts placed before us by the confessed allegations of the complaint will enable us to judge, there is nothing unreasonable in so regulating the pressure as to keep it down to three hundred pounds to the square inch. If the facts were such as to enable us to declare as matter of law that such a regulation was oppressive, unreasonable, or subversive of commercial rights, we should, perhaps, have a different question to determine, but in the pleading upon which we pronounce judgment there are no facts warranting any inference leading to the overthrow of the statutory provision here involved upon any such ground. When a case arises wherein it legitimately appears that under the pretext of enacting a police regulation the Legislature usurps power, invades property or commercial rights, then the courts will have to deal with questions different from those presented in this case.

The public safety and welfare is the highest consideration in all legislation, and to this consideration private rights must yield. No man has a right to so use a dangerous species of property as to put the safety of others in peril. Liberty does not imply the right of one man to so use property as to endanger the property of others, nor does ownership imply any such right. This is rudimental. It must, therefore, be true that the owner of property of such a dangerous nature as to require regulation to prevent injury to others can have no right paramount to the police power. It is not too much to say that as against the police power there is no such thing as a vested right. If the position of the appellees' counsel is tenable, then after a corporation has invested money in natural gas pipes, machinery and appliances, there can be no subsequent legislation, although the use of the pipes bought might put in peril towns, houses, and even human life along the entire line. The law is subject to no

such reproach as a rule like that for which appellees contend would bring upon it. No investment, however great, can so vest a right as to preclude the just exercise of a great governmental power such as that under which regulations for the protection of the health and safety of persons are enacted. This principle is supported by many decisions. In *Beer Co.* v. *Massachusetts*, 97 U. S. 25, it was said : " If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the Legislature can not be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer." An emphatic assertion and an unanswerable demonstration of the principle was given in *Mugler* v. *Kansas*, 123 U. S. 623, given, too, in cases where many thousands of dollars of property were rendered worthless. The principle has found expression in lottery cases, in cases respecting noxious trades, and in cases respecting the use of dangerous articles. *State* v. *Woodward*, 89 Ind. 110 ; *Stone* v. *Mississippi*, 101 U. S. 814 ; *Railroad Co.* v. *Richmond*, 96 U. S. 521 ; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650 (672) ; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659 ; *State* v. *Addington*, 77 Mo. 110 ; *Stickrod* v. *Commonwealth*, 86 Ky. 285 ; *Welsh* v. *State*, 126 Ind. 71 ; *Day* v. *Woodworth*, 13 How. 362.

A familiar application of the principle is that made in the great number of cases which hold that railway companies may be compelled to fence their tracks. The decisions everywhere prove that the police power may sleep but it does not die. The question, when the dormant power shall be aroused, is, as we have suggested, one for legislative decision. " Under our system," said the court in *Mugler* v. *Kansas*, *supra*, " that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for the

Jamieson *v.* The Indiana Natural Gas and Oil Company *et al.*

protection of public morals, the public health, or the public safety."

It is a mistake to suppose that regulating the use of property under the police power is a taking without process of law. This seems so clear that it is hardly necessary to cite authorities, but, nevertheless, we can not forbear quoting from the opinion in *Mugler* v. *Kansas, supra;* "A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, can not, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it." In the case at our bar there is no taking of property; there is simply a regulation of its use, leaving the ownership untouched. No owner has a right to use property in such a mode as to endanger the public safety, and hence no rights of ownership are impaired in a statute which protects the public safety by a reasonable regulation of the use of dangerous property.

We are satisfied that no provision of our State Constitution is violated by the act of 1891, and that it is not antagonistic to the fourteenth amendment of the Federal Constitution, nor to any provision of that instrument protecting vested or contract rights.

The general question which remains is that presented by the contention that the act of 1891 violates the provisions of the Federal Constitution vesting in Congress power over commerce between the States.

We preface our discussion of the principal question stated by saying that we are here concerned only with the general question of the power to regulate the pressure upon natural gas in pipes; for, according to the averments of the complaint, whether natural or artificial pressure be employed, the contract between the two corporations named can not be made effective without violating the act of 1891, by using

more pressure than three hundred pounds to the square inch. If there is power to regulate the pressure, then the corporation of which the appellant is a member ought not to be allowed to execute the contract described, since, under the confessed allegations of the complaint, it is impossible for one of the corporations to act without violating the statute. Courts are always reluctant to strike down a statute, or to decide constitutional questions, and they only decide them when imperatively necessary. Even then they decide only such as are absolutely essential to a disposition of the case, and are fully and clearly in the record. Cooley Const. Lim. (5th ed.), chap. vii.

Whether the act of 1891 usurps powers vested in Congress is to be determined from the language employed by its framers. If the language expressly or by necessary and unavoidable implication assumes to regulate interstate commerce, the act is a nullity. There is, however, no express regulation of interstate commerce, nor do we think that the necessary effect of the statute, when construed according to settled rules of law, is to limit or restrain commerce. If it were necessary to sustain the statute, and necessary to a decision of this case as made by the record to construe the statute as simply limiting artificial pressure to three hundred pounds, it would be our duty to so construe it, since that would be a sounder conclusion, in view of the provisions of the statute, than the conclusion that the Legislature intended to enact a statute which must be deemed a nullity. The rule is, that : " Before proceeding to annul, by judicial sentence, what has been enacted by the law-making power, it should clearly appear that the act can not be supported by any reasonable intendment or allowable presumption." *People, ex rel.,* v. *Supervisors,* 17 N. Y. 235 (241.)

We have no right to presume that the Legislature usurped power, or disregarded the organic law. No precedent will justify such a presumption, nor any reason sustain it. A party who asserts that the Legislature has usurped power,

or has violated the Constitution, must affirmatively and clearly establish his position. Nor have the courts the right to so construe a statute as to render it void, where a construction that is reasonably admissible will uphold it. Cooley Const. Lim.(6th ed.), p. 218. This is elementary law. We are, therefore, not dealing with a case where there is nothing more than a question as to the meaning and effect of a statute. We are to resolve doubts in favor of the validity of the statute, " without," as an able court has said, " stopping to inquire what construction * * might be warranted by the natural import of the language used." *Dow* v. *Norris*, 4 N. H. 16 (18).

It is our plain duty to uphold the statute, if it can be done by just intendment and reasonable presumption ; and the questions in the record do not require us to do more than decide upon the general question of the power to regulate the conveyance of natural gas in pipes.

Nothing in the words of the statute expresses or indicates a purpose to usurp a Federal power ; if there be any such usurpation it is because of the effect of the statute, and not because of any direct attempt to regulate interstate commerce ; but we have no right to ascribe such an effect to the statute, if any other fair and reasonable effect can be given it. We are not to destroy a statute when it can be fairly avoided.

A further prefatory suggestion seems appropriate, and that is this : The statute makes no discrimination ; it operates upon all alike. It affects the citizens of Indiana as it does others, and not differently. We know, as matter of common knowledge, as all courts must know, that there are parts of our State farther distant from the gas fields than are parts of the States by which ours is bounded. It can not, therefore, be implied that the statute was directed against the citizens of other States.

In considering the principal question, two things are im-

Jamieson v. The Indiana Natural Gas and Oil Company et al.

portant: *First*. Locality; and *Second*. The character of natural gas. Of these in their order.

The pipes for the transportation of the gas must be laid in our soil; they must cross our farms, pass through our towns, and cross our highways. There are many persons, many houses, and much property along the line, within the borders of our State. There is danger to our inhabitants, and to their property from the use of defective or insecure pipes, as well as from an improper use of them. If a volatile, inflammable, and explosive substance, such as natural gas, can not be conveyed in pipes, under an unsafe pressure, without danger to those whom it is the duty of the commonwealth to protect, then regulation is not unreasonable or illegal in itself. The danger is to our citizens in their own homes, and on our own thoroughfares. It can not, we suppose, be successfully asserted that a gas company could use pipes of paper, or of spider-webs, at their pleasure; and yet, if there is no power in the State to regulate the character of the pipes, or the like, this conclusion must result. They, indeed, may do what they please. The danger to be avoided is within the State; the protection of the law ought, upon every principle of justice, to be commensurate with the danger. The legislation is local, is for local protection, and for, presumptively, at least, no other purpose. Gas companies acquire the right to lay pipes by virtue of the power of eminent domain resident in the State, and surely if they take the benefit of our laws, and use our lands and minerals, they must yield obedience to such laws as are framed for the local protection. If they seize private property, and occupy highways under local laws, they must conform to those laws in using the privileges vouchsafed to them. The right to lay pipes, to sink wells, and to do similar things, is local in every particular. It is, from first to last, local; it is so in the acquisition of the original right, and in the exercise of the right acquired. It is certainly as essentially and characteristically local as the right to erect telegraph poles,

conduct laundries, or operate elevators, and over these things the State may legislate although the legislation may indirectly or incidentally affect commerce. It seems true beyond fair controversy that the State, by virtue of its inherent power, may provide that pipes shall be laid in trenches, or shall be of sufficient strength to be safe. Otherwise they might be laid on the ground subject to the action of the elements, or be of inadequate strength and thus be fruitful of danger to persons and property. It also seems entirely clear that the State may declare that gas shall not be confined in insufficient tanks or reservoirs, as is done respecting petroleum in States where it is obtained. If it be true that such regulations may be made it must also be true that pressure may be regulated, and that the State must, to a great extent, be the judge of the nature and character of the regulations required.

The local character of such a substance as natural gas is, we repeat, marked and peculiar. It is a natural product, and its source is in the soil, or rocks of the earth. It is as strikingly local as coal or petroleum, and yet no one has ever questioned the power of a State to enact laws governing mining. If it be not true that the mining and conveyance of natural gas may be regulated for the protection of persons and property, it must be true that many mining laws are void. Coal-oil is subject to inspection and regulation, and so must be natural gas, for it is more dangerous than coal-oil. It is so essentially local that only local regulations can be effective or appropriate. It is found in very few localities, and the character of locality is impressed upon it more clearly and strongly than upon almost any other natural product in the world.

We have considered (very briefly, however, because time presses) the question of the power to regulate the use of natural gas because of the local character of the product, upon principle, and we now consider the question upon authority. The decisions clearly recognize a distinction be-

tween local and general matters.   Necessarily this must be so, or else there would be no power in a State to declare where telegraph poles shall be placed, at what speed railroad trains shall be run through populous towns, or where noxious trades shall be conducted.   To deny the power to regulate the use of a product so purely and exclusively local as natural gas would be to annihilate the police powers of the State.

The principle which we here enforce is thus stated by the Supreme Court of the United States in *Western Union Tel. Co.* v. *Pendleton*, 122 U. S. 347 : "Undoubtedly, under the reserve powers of the State, which are designated under that somewhat ambiguous term of police powers, regulations may be prescribed by the State for the good order, peace, and protection of the community.   The subjects upon which the State may act are almost infinite, yet in its regulations with respect to all of them there is this necessary limitation, that the State does not thereby encroach upon the free exercise of the power vested in Congress by the Constitution.   Within that limitation it may, undoubtedly, make all necessary provisions with respect to the buildings, poles, and wires of telegraph companies in its jurisdiction which the comfort and convenience of the community may require."   If regulations may be made concerning buildings and wires used by telegraph companies, it is impossible to conceive why they may not be made concerning pumps, pipes, or the like, of natural gas companies.   There is infinitely more reason why the power should exist in the one case than in the other, since natural gas is a local product, intrinsically dangerous, and can only be conveyed from place to place in a peculiar mode.

There is another phase of the subject upon which the element of locality exerts an important influence.   The local and peculiar character of natural gas makes it almost impossible that it should be the subject of a general national regulation.   The principle here involved is affirmed in the strongest case that the appellees have adduced in support of

their position. In that case, *Leisy* v. *Hardin,* 135 U. S. 100, FULLER, C. J., speaking for the majority of the court, said : " Where the subject-matter requires a uniform system as between the States, the power controlling it is vested exclusively in Congress, and can not be encroached upon by the States ; but where, in relation to the subject-matter, different rules may be suitable for different localities, the States may exercise powers which, though they may be said to partake of the nature of the power granted to the general government, are strictly not such, but are simply local powers, which have full operation until or unless circumscribed by the action of Congress in effectuation of the general power. *Cooley* v. *Port Wardens of Philadelphia,* 12 How. 299." But the principle had long before been stated in stronger and clearer terms, and it has been often asserted and enforced. *Munn* v. *Illinois,* 94 U. S. 113 ; *Sherlock* v. *Alling,* 93 U. S. 99 ; *County of Mobile* v. *Kimball,* 102 U. S. 691 ; *Ouachita, etc., Co.* v. *Aiken,* 121 U. S. 444 ; *Morgan, etc., Co.* v. *Louisiana Board, etc.,* 118 U. S. 455.

Upon this point we affirm that natural gas is characteristically and peculiarly a local product, that its production is confined to a limited territory, that because of its local characteristics and peculiarities it is a proper subject for State legislation, and can not, so far as regards local protection, be made the subject of general legislation by Congress ; or, at all events, that it does " not require a uniform system as between the States " for its regulation.

We come now to a consideration of the question of the inherent dangerous qualities of natural gas as affecting the power of the State to regulate its use. We have already declared that it is a dangerous substance requiring regulation, and we shall only add to what we have said a quotation from the opinion in the case of *State* v. *Hayes,* 78 Mo. 307 : " It was not necessary," said the court, " to aver that coal-oil is inflammable or to prove it. Courts and juries will take cognizance of such matters as are of common knowl-

edge, and pertain to the affairs and experience of almost every man's daily life. Courts do not require proof that fire will burn, or powder explode, or gas illuminate, or that many other processes in nature and art produce certain known effects. 1 Greenl. Ev., section 56 ; *Brown* v. *Piper*, 91 U. S. 37 ; *Udderzook's Case*, 76 Pa. St. 340 ; *Garth* v. *Caldwell*, 72 Mo. 622 ; *Nagel* v. *Missouri Pac. R. W. Co.*, 75 Mo. 665 (666)." As natural gas is dangerous it is a proper subject for police regulation, and the affirmation of this proposition is a sufficient refutation of appellees' argument that it may be assumed that the statute, under guise of the police power, attempts to regulate interstate commerce, and thus usurps a Federal power. What the rule would be if natural gas were an article not dangerous, such as corn, wheat, or the like, we need not inquire, since the record does not present any such question.

The rule that courts take notice of geographical, historical or natural facts extends far and is an unbending one. In the case of *Jones* v. *United States*, 137 U. S. 202, the Supreme Court fully reviewed the authorities and declared that averments in a pleading would be disregarded in every instance where the court judicially knew that they were not true. We can not quote at length from the opinion, but must content ourselves with saying that it asserts in the strongest possible terms that what is judicially known to be false no pleading can effectively aver to be true. The practical application of this old and familiar doctrine to this case requires us to assert that the courts judicially know that natural gas is a local product that can not be handled, stored, or transported as an ordinary commercial commodity without imperiling life and property.

If natural gas can not be safely transported to a State distant from its source, it is because of its natural qualities, and not because of legislation. The restriction upon transportation, if there be any, is in the inherent nature of the thing itself ; none is put upon it by the statute, since the statute

Jamieson v. The Indiana Natural Gas and Oil Company et al.

does no more than regulate its conveyance from the wells to points of distribution in such a mode as to protect lives and property. This it does, and nothing more. If the distribution within the State can not be made at safe pressure, it is because of the character of the local natural product, not because of any standard of pressure fixed by legislation. Fixing the standard of pressure is not a regulation of interstate commerce; possibly it might be different if the product were not a local one, and intrinsically dangerous; but natural gas is local, and is dangerous in its transportation and use. It is the inherent element of danger that makes it necessary to handle, store, and transport natural gas in peculiar modes, and under reasonable restrictions.

It is true that natural gas may be an article of commerce, but it is not an ordinary article of commerce. It is not a commercial commodity while in the earth, it is only so when it ceases to become real estate and becomes personal property. It can not in any event become an ordinary article of merchandise in which no dangerous elements combine. In a limited and qualified sense it is a commercial commodity, but the limitation is not put upon it by any statute. That is done by nature. It is, no doubt, so far a commercial commodity that this State can not prohibit its transportation to another State by direct legislation. *State, ex rel.*, v. *Indiana, etc., Co., supra.* If it can be taken from the well and transported to another State under a safe pressure the State can not prohibit its transportation, nor can the State establish one standard of pressure for its own citizens and another standard for the citizens of other States. But nothing of the kind is attempted directly or indirectly, for, as we have shown, there is one standard and no prohibition. The standard is for all. If it is such as will allow the transportation of natural gas to other States, there is no restriction or burden upon interstate commerce. If there is a prohibition in any sense, or to any extent, it is in the nature of the commodity itself, but there is no prohibition.

We have shown, as we believe, that natural gas, because of its local nature and intrinsic qualities, can not be made the subject of general commerce between the States, and have thus established the conclusion that it can not, so far as local safety is concerned, be made the subject of uniform Federal legislation, but is a legitimate subject for reasonable police regulation.   But if it be conceded that it is the subject of general commerce between the States, it may, nevertheless, be the subject of legislation by the State in so far as the regulation is local.   In every case in which there is an authoritative decision upon the question it is affirmed that the States may make police regulations, although articles of commerce may be affected by such regulations.    Interstate commerce, it is true, can neither be burdened nor restricted. *State* v. *I. & O., etc., Co., supra.*  But the establishment of a reasonable police regulation for the local safety is neither a burden nor a restriction within the meaning of the law ; since, if there be a lawful exercise of a governmental power, there can be no wrong.   Our own cases recognize the power to enact reasonable police regulations concerning articles of commerce. *State* v. *I. & O., etc., Co.,* p. 580.  But our decisions are of comparatively little importance upon this question, since the question is one to be determined by the decisions of the Supreme Court of the United States.  The most familiar instances of the exercise of police power over commercial commodities are those wherein intoxicating liquors were the subject of legislation, and it has been uniformly held that such commodities are subject to State authority. *Crowley* v. *Christensen, supra ; Mugler* v. *Kansas, supra,* and authorities cited.

In asserting this we are not unmindful of the decision in *Leisy* v. *Hardin*, 135 U. S. 100, but that decision is easily discriminated from the class of cases to which we have referred as well as from the case before us.  In *Leisy* v. *Hardin, supra,* the State legislation was condemned because it operated directly upon an ordinary and world-wide article of

commerce. We do not assume that a State can legislate for the regulation of interstate commerce—that power is undoubtedly Federal—nor do we assume that under the guise of exercising the police power there may be a regulation of commerce between the States, but we do assume that it is settled by the decisions that State legislation is not invalid simply because it operates upon or affects commercial commodities or instrumentalities. So long as there is nothing more than an exercise of the police power, and no regulation of commerce, there is nothing more than the exercise of a State power.

In *Prigg* v. *Pennsylvania*, 16 Pet. 539, Judge STORY, speaking for the court, said : " The police power belonging to the States, in virtue of their general sovereignty, extends over all subjects within the territorial limits of the State and has never been conceded to the United States." This general doctrine is affirmed in many cases, and it is conceded in the majority opinion in *Leisy* v. *Hardin*, *supra*. We know that the decision in that case affirms that where the whole subject is Federal, the States can exercise no power, but that doctrine we neither dispute nor deny, although we do affirm that it is not applicable to such a case as this. In affirming that State police regulations may rightfully operate upon articles of commerce we do not affirm that commerce may be regulated. If police regulations can not operate upon articles of commerce, then there are few kinds of personal property upon which they can operate. To deny that State legislation can operate upon commodities that are commercial is to practically annihilate it, for it is difficult, if not impossible, to conceive any species of personal property that is not commercial. But it is by no means only property such as intoxicating liquors upon which the police power of a State may be exercised. In the case of *United States* v. *Dewitt*, 9 Wall. 41, a penalty was imposed by a United States statute upon any person who should offer for sale oil manufactured

from petroleum unless it was of a designated specific gravity, and it was held that such a power belonged to the police power of the State.

A similar question came before the court in *Patterson v. Kentucky*, 97 U. S. 501, and the State statute was upheld. The opinion in that case so fully and ably discusses the question that we can not forbear quoting from it at some length. The learned judge, by whom the court spoke, said : " ' In the American constitutional system,' says Mr. Cooley, ' the power to establish the ordinary regulations of police has been left with the individual States, and can not be assumed by the national government.' Cooley Const. Lim. 574. While it is confessedly difficult to mark the precise boundaries of that power, or to indicate by any general rule the exact limitations which the States must observe in its exercise, the existence of such a power in the States has been uniformly recognized in this court. *Gibbons* v. *Ogden*, 9 Wheat. 1 ; *License Cases*, 5 How. 504 ; *Gilman* v. *Philadelphia*, 3 Wall. 713 ; *Henderson* v. *Mayor of the City of New York*, 92 U. S. 259 ; *Railroad Co.* v. *Husen*, 95 *Id.* 465 ; *Beer Co.* v. *Massachusetts, supra*, p. 25. It is embraced in what Mr. Chief Justice MARSHALL, in *Gibbons* v. *Ogden*, calls that ' immense mass of legislation ' which can be most advantageously exercised by the States, and over which the national authorities can not assume supervision or control. ' If the power only extends to a just regulation of rights, with a view to the due protection and enjoyment of all, and does not deprive any one of that which is justly and properly his own, it is obvious that its possession by the State, and its exercise for the regulation of the property and actions of its citizens, can not well constitute an invasion of national jurisdiction or afford a basis for an appeal to the protection of the national authorities.' Cooley Const. Lim. 574. By the settled doctrines of this court the police power extends, at least, to the protection of the lives, the health, and the property of the community against the injurious exercise by any citizen

of his own rights. State legislation, strictly and legitimately for police purposes, does not, in the sense of the Constitution, necessarily intrench upon any authority which has been confided, expressly or by implication, to the national government. The Kentucky statute under examination manifestly belongs to that class of legislation. It is, in the best sense, a mere police regulation, deemed essential for the protection of the lives and property of citizens. It expresses in the most solemn form the deliberate judgment of the State that burning fluids which ignite or permanently burn at less than a prescribed temperature are unsafe for illuminating purposes. Whether the policy thus pursued by the State is wise or unwise, it is not the province of the national authorities to determine. That belongs to each State, under its own sense of duty, and in view of the provisions of its own Constitution. Its action, in those respects, is beyond the corrective power of this court. That the statute of 1874 is a police regulation within the meaning of the authorities is clear from our decision in *United States* v. *Dewitt, supra.* By the internal revenue act of March 2d, 1867, a penalty was imposed upon any person who should mix for sale naptha and illuminating oils, or who should knowingly sell or keep for sale, or offer for sale, such mixture, or who should sell or offer for sale oil made from petroleum for illuminating purposes, inflammable at less temperature or fire-test than 110° Fahrenheit. We held that to be simply a police regulation, relating exclusively to the internal trade of the States; that, although emanating from Congress, it could have by its own force no constitutional operation within State limits, and was without effect, except where the legislative authority of Congress excluded, territorially, all State legislation, as, for example, in the District of Columbia."

Other decisions assert like principles: *Webber* v. *Virginia,* 103 U. S. 348; *Turner* v. *Maryland,* 107 U. S. 38; *Cooley* v. *Board, etc.,* 12 How. 299; *Crandall* v. *State,* 6 Wall. 35; *Knox* v. *Lee,* 12 Wall. 457; *Slaughter-House Cases,* 16

Wall. 36; *Coleman* v. *Tennessee*, 97 U. S. 509; *Presser* v. *Illinois*, 116 U. S. 252; *Tennessee* v. *Davis*, 100 U. S. 257. The principle we have stated is involved in the cases where regulations were made respecting the instrumentalities of commerce. It is involved in the very numerous cases already mentioned requiring railroads to fence their tracks; it is involved in cases requiring trains to stop at the crossing of other railroads, and in many other cases of like character. It is strongly and broadly asserted in the cases which hold valid State statutes requiring trainmen, or engineers, to be examined as to their qualifications, as well as in cases concerning pilots. *Smith* v. *Alabama*, 124 U. S. 465; *Nashville, etc., R. W. Co.* v. *Alabama*, 128 U. S. 96; *Sherlock* v. *Alling, supra; Cooley* v. *Board, etc.*, 12 How. 299; *Ex parte McNiel*, 13 Wall. 236; *The Panama*, Deady, 27; *Ex parte Siebold*, 100 U. S. 371; *Wilson* v. *McNamee*, 102 U. S. 572; *State* v. *Penny*, 19 S. C. 218. In the first of the cases cited it was said:

" The width of the gauge, the character of the grades, the mode of crossing streams by culverts and bridges, the kind of cuts and tunnels, the mode of crossing other highways, the placing of watchmen and signals at points of special danger, the rate of speed at stations and through villages, towns, and cities, are all matters naturally and peculiarly within the provisions of that law, from the authority of which the modern highways of commerce derived their existence. The rules prescribed for their construction, and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the limits of the local law. They are not *per se* regulations of commerce."

The provision of our statute of 1891, limiting the pressure upon natural gas confined in pipes, is certainly as essentially a police regulation as any of the acts enumerated by the Supreme Court of the United States in the case from which we have quoted. It is equally as clear that it is not

*per se* a regulation of interstate commerce. Pipes are local vehicles of conveying the dangerous product, and pressure is the power locally employed.

The decisions relied upon by the appellees do not oppose the conclusion that the use of such an article as natural gas may be regulated. In our own case of *State, ex rel., v. Indiana, etc., Co., supra,* the statute was, in terms, a regulation of commerce between the States, and, moreover, was an absolute inhibition upon the exportation of natural gas, so that the decision there made is not in point. Of *Leisy* v. *Hardin, supra,* we need only say, in addition to what has been already said, that the State law there overthrown by a majority of the court was a direct prohibition of the sale of a general article of commerce in its original form, not a regulation of its use. It is obvious that regulating the use of a dangerous article is a very different thing from prohibiting its sale, and still wider is the difference where, as here, the article is inherently dangerous, and not of an ordinary commercial character. The cases of *Welton* v. *State,* 91 U. S. 275; *Brown* v. *Houston,* 114 U. S. 622; *Walling* v. *Michigan,* 116 U. S. 446, involved the power of a State to levy a tax upon interstate commerce, and are not of controlling force upon such a question as that before us, because they are not relevant to the point in dispute. The case of *Bowman* v. *Chicago, etc., R. W. Co.,* 125 U. S. 465, involved the validity of a State statute absolutely prohibiting the importation of a commercial commodity, and it is without influence here, for here we have no such question. *County of Mobile* v. *Kimball, supra,* decides that a municipal corporation may be authorized to issue bonds to improve a harbor, but decides nothing that lends support to the appellees' assault upon the act of 1891. It does, however, contain statements that give strong support to the proposition that local matters may be regulated by State laws although they are connected with interstate commerce. The cases of *Chy Lung* v. *Freeman,* 92 U. S. 275, and *Henderson* v. *Mayor,* 92 U. S. 259, relate entirely to the power of a State

to regulate immigration, and pour little or no light on the question with which we are here concerned. In *Hannibal, etc., R. R. Co.* v. *Husen,* 95 U. S. 465, it was held that a State could not prohibit the importation of cattle, but here we have no such question, for here there is no prohibition; there is merely the regulation of the mode of conveying from the wells a local product of an intrinsically dangerous nature. The case of *Kimmish* v. *Ball,* 129 U. S. 217, modifies the decision in *Hannibal, etc., R. R. Co.* v. *Husen, supra,* or, at least, explains it. But in *Hannibal, etc., R. R. Co.* v. *Husen, supra,* it was said: " Many acts of a State may, indeed, affect commerce without amounting to a regulation of it, in the constitutional sense of the term." This doctrine is directly applicable here, for here the statute regulates the use of a dangerous substance and thus incidentally affects commerce, but it is not a regulation of commerce " in the constitutional sense of the term."

A regulation of the mode of using property is not necessarily prohibition, or restriction, and the statute before us is no more than such a regulation. The opinions in the cases of *Minnesota* v. *Barber,* 136 U. S. 313, and *Brimmer* v. *Rebman,* 138 U. S. 78, were written by the same great judge, Mr. Justice Harlan, who wrote the opinions in *Patterson* v. *Kentucky, supra,* and in *Smith* v. *Alabama, etc., Co., supra,* and there is not in them the slightest intimation of a departure from the doctrine of the former cases; on the contrary, those doctrines are adhered to, and the meat inspection laws were condemned because they discriminated against the citizens of other States. In the latter case it is said: " The case, in principle, is not distinguishable from *Minnesota* v. *Barber,* where an inspection statute of Minnesota, relating to fresh beef, veal, mutton, lamb, and pork, was held to be a regulation of interstate commerce and void, because, by its necessary operation, it excluded from the markets of that State, practically, all such meats—in whatever form, and although

entirely sound and fit for human food—from animals slaughtered in other States."

The difference between the meat inspection cases and the present is essential and clear. Here there is no discriminaton; here there is nothing more than the regulation of a natural, local and intrinsically dangerous product; while in the inspection cases there was discrimination; indeed, absolute prohibition, and the article was not dangerous, nor of a local or unusual character.

In *Minnesota* v. *Barber, supra,* the court shows very clearly the difference between that case and the case of *Patterson* v. *Kentucky* (which is cited with approval), and in doing this proves that the principle asserted in *Patterson* v. *Kentucky,* rules here, and that the doctrine of *Minnesota* v. *Barber,* is not relevant to such a question as the one presented by the ruling upon the complaint before us.

The trial court erred in sustaining the demurrer to the complaint, for in thus ruling it adjudged that the provision of the act of 1891, regulating the pressure that may be placed upon natural gas, confined in pipes, is void. That was the question before it upon the complaint, and it is the question before us. The effect of this ruling was to adjudge that the appellant's complaint did not state a cause of action, for the reason that the statutory provision referred to was, upon the case stated by the pleading, unconstitutional. Beyond that case the trial court could not justly go, nor can we.

For the error in sustaining the demurrer to the complaint the judgment is reversed.

Filed June 20, 1891.

## INDIVIDUAL OPINION.

McBRIDE, J.—The Legislature may undoubtedly provide for the regulation of the mode of procuring, using and transporting natural gas. In so far as the act of March 4th, 1891, attempts to do this, it is a legitimate exercise of the police

Jamieson v. The Indiana Natural Gas and Oil Company *et al.*

power of the State, and not an interference with the power of Congress to regulate interstate commerce.

Section 1 of the act, however, contains a provision which, literally construed, forbids the transportation of natural gas through pipes otherwise than by the natural pressure of the gas flowing from the wells, and section 2 contains a provision which, similarly construed, declares it to be unlawful to use any device or artificial process or appliance to maintain the natural flow of natural gas.

These provisions are not in the nature of regulations, but are prohibitory in their character. They are, however, independent provisions, which may be eliminated from the statute without materially impairing its efficiency, if its purpose is simply to regulate the production, transportation and use of natural gas.

As I understand the principal opinion, it holds that, notwithstanding these provisions of the statute, artificial pressure may be applied, provided it does not exceed three hundred pounds to the square inch. Whether this conclusion is reached by construction, or by eliminating the objectionable features of the statute, is not material. I concur in the conclusion reached.

Filed June 20, 1891.

### DISSENTING OPINION.

OLDS, J.—I can not cöncur in the main opinion in this case. There are many propositions stated in the main opinion, and ably discussed and supported by copious quotations and citations of authorities, with some of which I agree, but do not regard them as decisive of the questions involved in this case.

As it seems to me, the question as to the validity of the complaint depends upon the validity and construction of the act of the Legislature of Indiana passed by the General Assembly March 4th, 1891, which is as follows :

"An act to regulate the mode of procuring, transporting and using natural gas, and declaring an emergency.

" Section 1. *Be it enacted by the General Assembly of the State of Indiana,* That any person or persons, firm, company or corporation engaged in drilling for, piping, transporting, using or selling natural gas may transport or conduct the same through sound, wrought or cast iron casings and pipes tested to at least four hundred pounds pressure to the square inch : *Provided,* Such gas shall not be transported through pipes at a pressure exceeding three hundred pounds per square inch, nor otherwise than by the natural pressure of the gas flowing from the wells.

" Sec. 2. It is hereby declared to be unlawful for any person or persons, firm, company or corporation to use any device for pumping or any other artificial process or appliance for the purpose, or that shall have the effect of increasing the natural flow of natural gas from any well, or of increasing or maintaining the flow of natural gas through the pipes used for conveying and transporting the same.

" Sec. 3. Any person or persons, firm, company or corporation violating any of the provisions of this act shall be fined in any sum not less than one thousand dollars nor more than ten thousand dollars, and may be enjoined from conveying and transporting natural gas through pipes otherwise than in this act provided : *Provided,* That nothing in this section shall operate to prevent the use of nitro-glycerine or other explosives for shooting any well or wells from which the gas is procured.

" Sec. 4. It is hereby declared that an emergency exists for the immediate taking effect of this act, and the same shall take effect from and after its passage."

In my opinion the decision is erroneous. This law does not seem to me to have been framed with an intention or with an effort on the part of the General Assembly to exercise the legitimate police power vested in the State. It does not attempt to regulate the transportation of natural gas, but

its sole purpose is to prohibit the transportation, sale and use of gas beyond the distance which the natural pressure from the well will transport it. Strictly construed, according to the letter, it does not permit its transportation through pipes at the natural well pressure, if such pressure exceed three hundred pounds to the square inch, nor does it permit any artificial method or device to increase the natural well pressure to that standard if the well pressure should be below the amount of pressure designated.

The statute, upon its face, admits that the transportation of gas at a pressure of three hundred pounds to the square inch through sound wrought or cast iron casings and pipes tested to at least four hundred pounds to the square inch is safe, yet it prohibits the increase of the pressure of a well of less pressure than that degree, and prohibits any transportation by artificial methods, even to this extent, though admitting it is safe to do so.

In the case of State, ex rel., v. Indiana, etc., Co., 120 Ind. 575, this court said : " In order to give any force to this contention it is necessary to determine, at the outset, whether natural gas can be considered an article of commerce. With this preliminary question we have but little difficulty. Natural gas is as much an article of commerce as iron ore, coal, petroleum, or any other of the like products of the earth. It is a commodity which may be transported, and it is an article which may be bought and sold in the markets of the country." In support of this proposition the following authorities were cited.   Citizens', etc., Co. v. Town of Elwood, 114 Ind. 332 ; Carother's Appeal, 118 Pa. St. 468 ; Columbia Conduit Co. v. Commonwealth, 90 Pa. St. 307 ; West Virginia, etc., Co. v. Volcanic Co., 5 W. Va. 382 ; The Daniel Ball, 10 Wall. 557 ; Kidd v. Pearson, 128 U. S. 1.

This court further said : " The gas in the earth may not be a commercial commodity, but, when brought to the surface and placed in pipes for transportation, it must assume that character as completely as coal on the cars or petro-

leum in the tanks." The doctrine contained in the quotations which I have made from *State, ex rel.*, v. *Indiana, etc., Co., supra*, is well suppported by authority, and with it I most fully concur.

That gas and petroleum are to some extent inflammable, explosive and dangerous, I am free to admit, and that courts take judicial knowledge of the fact. But coal is in common use for fuel; petroleum in common use for lighting purposes, and to some extent for fuel; natural gas, in the communities where it is mined and has been carried through pipes, is in common use as fuel and for heating purposes, and to some extent for lighting purposes; and but few, if any, more accidents or deaths occur from its use than do from the use of coal or petroleum. We read of accidents and deaths occurring in various ways from the use of coal and petroleum as well as natural gas. As well might the Legislatures of the various States, within the borders of which there are oil fields, pass a law prohibiting the pumping of the oil from wells and the transportation of the same to any greater distance than its natural flow from the wells will carry it, while admitting that it can be safely transported in casks and tanks, as to say that the Legislature, while admitting that natural gas may be transported with safety in pipes at a pressure to the extent of three-fourths of the tested pressure of the pipes, may prohibit its transportation by artificial methods or devices in the same safe manner by a pressure not exceeding three-fourths of the tested pressure of the pipes through which it is transported; either of which propositions seem to me to be a prohibition, an interference with commerce against the rights of citizens in the free disposition of their property, and unfounded in law.

It is not necessary in this case to deny that the Legislature has a right to exercise police power over the transportation of natural gas, for, admitting that it has, and can exercise it to a reasonable extent, so as to prevent its transportation in a careless, reckless and unsafe manner, unnecessarily endan-

gering its citizens, still I do affirm that the Legislature can only exercise this power to a reasonable extent, so as to secure its transportation in a safe manner, as not to unnecessarily endanger the citizens of the State, and that it can not under the color of exercising a police power absolutely prohibit its transportation and sale in a safe manner to suitable markets, and the latter is what is attempted to be done by this statute.

This statute, conceding that natural gas can be transported in the manner stated, prohibits its transportation beyond the distance it will naturally flow from the wells, which it is admitted in argument is not to exceed sixty or seventy miles at farthest.

As said in the case of *State, ex rel.,* v. *Indiana, etc., Co., supra,* natural gas is an article of commerce, and the owner of it may sell it for use within the distance which it may be transported by the natural flow of the well, or beyond such distance, and it may be transported in a proper and safe manner beyond that distance by artificial methods, and this can not be prohibited by legislative enactment.

In the case of *Matter of Application of Jacobs,* 98 N. Y. 98 (110), after citing and quoting from numerous authorities, in speaking of the police power of the State, the court says : " These citations are sufficient to show that the police power is not without limitations, and that in its exercise the Legislature must respect the great fundamental rights guaranteed by the Constitution. If this were otherwise, the power of the Legislature would be practically without limitation. In the assumed exercise of the police power in the interest of the health, the welfare or the safety of the public, every right of the citizen might be invaded and every constitutional barrier swept away. Generally it is for the Legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended, convenient and appropriate to accomplish these ends, the exercise of its dis-

cretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property can not be arbitrarily invaded, and the determination of the Legislature is not final or conclusive. If it passes an act ostensibly for the public health, and thereby destroys or takes away the property of a citizen, or interferes with his personal liberty, then it is for the courts to scrutinize the act and see whether it really relates to and is convenient and appropriate to promote the public health. It matters not that the Legislature may in the title to the act, or in its body, declare that it is intended for the improvement of the public health. Such a declaration does not conclude the courts, and they must yet determine the fact declared and enforce the supreme law."

In the case of *Mugler* v. *Kansas*, 123 U. S. 623, the eminent jurist, Justice HARLAN, speaking for the highest court of the world, said: "If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." See *Minnesota* v. *Barber*, 136 U. S. 313.

It will not be controverted that the owner of land is the owner of gas mined upon his own land; that it is his property.

The right of private property includes the right to dispose of all one's legal acquisitions without illegal restraint or diminution. These principles are almost as old as the law itself.

The Constitution of the United States provides that " No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law."

The Constitution of Indiana, in the bill of rights, declares

that "all men are endowed with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." It is also declared that "No man's property shall be taken by law without just compensation."

See the following authorities, as bearing upon the questions involved in the case : *Hennessy* v. *City of St. Paul*, 37 Fed. Rep. 565 ; *Cole* v. *Kegler*, 64 Iowa, 59 ; *Harvey* v. *Dewoody*, 18 Ark. 252; *State* v. *Mott*, 61 Md. 297 ; *Manhattan Manufacturing, etc., Co.* v. *Van Keuren*, 23 N. J. Eq. 251 ; *Glenn* v. *Mayor*, 5 Gill & J. 424; *Bills* v. *Belknap*, 36 Iowa, 583 ; *Everett* v. *City of Council Bluffs*, 46 Iowa, 66 ; *Quenton* v. *Burton*, 61 Iowa, 471 ; *Everett* v. *City of Marquette*, 53 Mich. 450 ; *Ames* v. *Port Huron Log Driving, etc., Co.*, 11 Mich. 139 ; Sedgwick on Stat. and Const. Law, p. 534 ; *New Albany, etc., R. R. Co.* v. *Peterson*, 14 Ind. 112; *Acton* v. *Blundell*, 12 M. and W. 324 ; *City of Greencastle* v. *Hazelett*, 23 Ind. 186 ; *Haldeman* v. *Bruckart*, 45 Pa. St. 514 ; *Wheatley* v. *Baugh*, 23 Pa. St. 528 ; *Taylor* v. *Fickas*, 64 Ind. 167 ; Angell Watercourses, sections 94, 135 ; *State, ex rel.,* v. *Woodruff Sleeping, etc., Co.*, 114 Ind. 155 ; *Hannibal, etc., R. R. Co.* v. *Husen*, 95 U.S. 465 ; *County of Mobile* v. *Kimball*, 102 U.S. 691; *Walling* v. *People, etc.*, 116 U. S. 446 ; *Leisy* v. *Hardin*, 135 U. S. 100 ; *Minnesota* v. *Barber, supra* ; *Brimmer* v. *Rebman*, 138 U. S. 78.

It is clearly apparent that the statute in question had for its purpose the prohibition of the transportation of natural gas, and confining its use and sale to a limited territory; curtailing its use, diminishing its value, abridging the rights of the owners, and other persons who might wish to buy and transport it to markets beyond the distance which the natural well pressure will carry it, absolutely prohibiting its use and sale beyond a small territory wherein it can be distributed by the natural well pressure ; and if subject to be safely transported into other States it necessarily interferes with interstate commerce.

I have hurriedly and briefly stated some of the objections

to the constitutionality of the law. No good can be accomplished by extending this opinion, and discussing each question involved separately, and supporting the position by authority. I believe the law to be unconstitutional and void for several reasons, and the law being void the complaint was bad, and the demurrer was properly sustained. To uphold the law at all it is necessary to strike out all the Legislature has said in such emphatic terms that no artificial methods can be used in transporting natural gas, or even in keeping up its pressure, and interpolate in lieu thereof an allegation that artificial methods may be used to the extent of three hundred pounds to the square inch in pipes tested to the strength of four hundred pounds to the square inch. In view of the absolute and positive prohibition against the use of any artificial methods expressed in the statute, it seems to me no such intention can be attributed to the Legislature, or such a construction given to the law.

Filed June 20, 1891.